CHARLES EDWARD SHANNON, Plaintiff in Error,

*v.*

STATE OF TENNESSEE, Defendant in Error.

427 S.W.2d 26.

(*Knoxville,* September Term, 1967.)

Opinion filed April 15, 1968.

DOUGLAS A. MEYER, Chattanooga, for plaintiff in error.

GEORGE F. MCCANLESS, Attorney General, and LANCE D. EVANS, Assistant Attorney General, Nashville, for defendant in error; and EDWARD E. DAVIS, District Attorney General, Chattanooga, prosecuted the case in trial court.

PER CURIAM.

Charles Edward Shannon was convicted of second degree murder, and his punishment fixed at not more than ten years in the penitentiary. He has appealed, assigning a number of errors, only one of which we notice: That by which he invokes the protection of *Miranda v. State of Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), with respect to certain evidence introduced against him at the trial. Since this assignment of error is good, the discussion will be limited to it.

Sometime on the day of July 29, 1966, possibly between 9:35 A.M., and 1:30 to 2:00 P.M., Mrs. Gunnie E. Lasley was murdered at her home on Green Pond Road in Daisy, Hamilton County, Tennessee. Death was caused by stab wounds and skull fractures.

Shannon, who lived with his mother in a house located 150 to 200 yards south of the deceased's house, reported the homicide to the Hamilton County Sheriff's office at 3:45 P.M. When the officers arrived, they found defendant at the scene. He was dressed in a sport shirt over a white T-shirt, a pair of trousers and shoes. Defendant was not taken immediately into custody by the police, who com-

menced an investigation of the house where Mrs. Lasley had been killed. Later, thoroughly searching the Shannon house, they found no evidence incriminating Shannon in either search. Later that day Shannon was taken into custody and questioned, resulting in a written statement in which he described his activities on the day of the murder, stating that the last time he saw deceased was on her front porch with a boy who had been doing some yard work for her. That he discovered Mrs. Lasley's body, after he had gone over to her house for some purpose. That he had then called the police.

The police were unable to uncover any evidence connecting anyone with the crime from July 29 to August 15. No blood had been found on defendant's clothes or any clothes in his house, or on any object in defendant's house. Hair was clipped off of defendant's head and arms, part of the heel of his shoe was taken, and these items were sent to the F.B.I. Laboratory along with some hair that had been clutched in the deceased's hand, and the report from the laboratory on these items was negative. Later, a knife taken from defendant's house was also sent off to the F.B.I. Laboratory, and a negative report was received on it. But before this knife was sent to the laboratory, on August 15, 1966, Detective Officers Chief Russell, F.B.I. Agent, Joe Hannah, and Officer Bill Chapman, took Shannon to a motel for interrogation. Shannon was approximately forty-three years old, an honorably discharged war veteran, who lived with his mother in her home. During his service in World War II, his leg was injured and after he was discharged it received another injury resulting in a bone infection which made it necessary to amputate the leg—the left leg—some four inches above the knee. Sometime later,

defendant virtually lost the use of his other leg from a condition he described as a paralysis, and Buerger's Disease. Shannon stated he had had to leave school while in the fourth grade, because of a physical condition, and could not read or write, except to sign his name. He was unable to find and keep any regular employment and other than a small veteran's pension had no income except from odd jobs. The record shows Shannon to be an alcoholic. When he was first questioned on August 29, he was on the verge of delirium tremens, a condition recognized by his questioners, who furnished him with whiskey to ward off such an attack.

After Shannon had been carried to the motel, although he at first declined, he was ultimately persuaded to submit to a lie detector test. After this test, Shannon was advised he had not passed it; that it showed that he had not answered truthfully certain questions asked him. After this, Shannon was interrogated by officers, with the questioning resulting in an alleged confession. At this time a typist was sent for, and the confession reduced to writing. According to the testimony of the typist it was necessary for the officer primarily in charge of taking the confession and having it reduced to writing, to prompt Shannon as to what he should say. The officer's explanation as to this was that he was simply refreshing Shannon's recollection as to facts Shannon had already orally confessed; in no way undertaking to supply any facts for Shannon.

After the confession had been reduced to writing and Shannon had signed it and it had been witnessed, Shannon was put in jail. It is pertinent to mention that Shannon was under interrogation for five or six hours and there is a question raised, whether he tried to get the officers to

give him whiskey, but this was denied by the interrogators. It is not denied, however, that Shannon was alone with his questioners, without counsel or friends.

After Shannon had been put in jail acting on information gotten at the interrogation, the law officer primarily in charge of his interrogation went again to Shannon's mother's home, where he took two knives. These he carried to the jail and showed to Shannon who, according to the testimony, made an incriminating statement with respect to one of the knives.

That evening, or the next morning, Shannon was taken from his cell and carried before an officer, the coordinator of the Detective Department, with thirty-one years experience in police work to be booked on a charge of murder. This officer, who testified that he was aware defendant had been charged with murder, and was of opinion he had waived his constitutional rights as guaranteed him by Miranda as he had seen the written waiver and had heard police officers talking to Shannon after the waiver was signed, testified that while he was booking Shannon, that he started off complaining of his health and of his leg giving him trouble. That he had been in jail and that he wasn't "getting any help" and that he told Shannon he would go with him after he had fingerprinted him, "down there and see if I could get him sent to the hospital, is the way that it started out." This officer then testified Shannon told him, in substance, that he and Mrs. Lasley were talking, and that she made a remark about a woman he had lived with in Nashville as a common law wife, and that "he got all up in the air about it and when he came to she was on the floor dead, and he said she was like a mother to me and I had no reason in the world to kill that woman."

■ On the trial of the case the confession was excluded by the trial judge on the ground it was not a voluntary confession, being coerced from defendant by the reference by his interrogators to his failure to successfully pass the lie detector test. However, the chief interrogating officer was permitted to testify, over defendant's objection, concerning Shannon's incriminating statement about the knife which the officer had taken possession of as a result of the confession, and the booking officer was permitted to give in evidence the statement made by Shannon during the booking procedure. Error is assigned here on authority of *Miranda* with respect to all of this evidence. It is clear beyond question that although this offense was subsequent to the opinion of the United States Supreme Court in *Miranda,* Shannon was not afforded the constitutional guarantees clearly outlined in that opinion. He was not advised that if, because of his indigency he could not afford to employ counsel, counsel would be furnished him by the State. It is true the officers had Shannon sign a waiver, but this waiver simply does not meet the *Miranda* test.

This waiver, Exhibit 8, to the direct testimony of the chief interrogating officer, says with respect to Shannon's rights to counsel, the following:

"I have also been told that I have the right to call a lawyer or have one called for me and have him present."

This, of course, does not meet the standard with respect to this subject clearly laid down in the Miranda case. Concerning this that decision says:

■■ "Accordingly we hold that an individual held for interrogation must be clearly informed that he

has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right.''

"In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it.'' 86 S.Ct. 1626, 1627.

When the waiver is read in the light of these quotations it is too obvious that it falls short of the plain requirement with respect to counsel. So that the entire confession

in all its parts, including the testimony with respect to the knives and the statement made by Shannon to the booking officer on the same day or the next day, still without benefit of counsel, and without waiving counsel, should have been excluded. The second statement was "patently the fruit of the earlier one" and equally inadmissible. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426; *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307; *Westover v. United States,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Evans v. United States,* 8 Cir., 375 F.2d 355 (1967). In the *Miranda* opinion this is said:

> "[58-60] The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. *No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense.* The privilege against self incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination.

> \*　　\*　　\*　　\*　　\*　　\*

> "The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way. It is at this point that our adversary system of criminal proceedings commences, distin-

guishing itself at the outset from the inquisitorial system recognized in some countries. Under the system of warnings we delineate today or under any other system which may be devised and found effective, the safeguards to be erected about the privilege must come into play at this point." 86 S.Ct. 1629.

■ In the light of these statements this Court cannot in good conscience, by the artifice of calling Shannon's continued confession to the booking officer, a voluntary admission against interest, permit it to be used as evidence. Especially, when it is obvious as can be that from the very beginning, in spite of the plain and clear warning of the Supreme Court of the United States in *Miranda* by which this Court and all other courts and law enforcement officers are bound, the officers in charge of the investigation pursued an unconstitutional and illegal course to supply by confession the evidence they had not been able to uncover by police work.

The sooner it is realized by all concerned that the *Miranda* guarantees must be afforded an accused, in full good faith and with intention on the part of the interrogators to comply fully therewith, in the spirit in which these tests are laid down and required, the sooner the time will come when it will not be necessary for this Court to reverse as it must do in this case. Let it be noted that the concern of this Court is not to favor a defendant but to see that the scales of justice be in balance between him and the State, which cannot be if the constitutional guarantees of *Miranda* can be withheld by its officers.

The assignment of error is sustained, the judgment of the trial court is reversed and the case is remanded for a new trial.