Argued June 18, reversed and remanded for new trial
August 11, 1975

# STATE OF OREGON, *Respondent, v.* MITCHELL LLOYD (No. 5785), *Appellant.*

538 P2d 1278

*Gary D. Babcock,* Public Defender, Salem, argued the cause and filed the brief for appellant.

*Donald L. Paillette,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*William C. Snouffer,* Portland, filed a brief amicus curiae on behalf of American Civil Liberties Foundation of Oregon, Inc.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

LANGTRY, J.

Defendant appeals from convictions on two counts of manslaughter (ORS 163.125) and one count of reckless burning (ORS 164.335), arguing that the circuit court erred in refusing to exclude from evidence testimony about, and recordings of, statements elicited from him by police during a period of alleged illegal detention extending over some four-and-one-half days prior to his arrest on May 29, 1974.

Having responded to a report of a residential fire during the early morning hours of May 25, 1974, Pendleton City Police Officers Anderson and Moore discovered defendant, in an extremely intoxicated

state, "passed out" in a nearby parking lot. Aroused and directed to "go home," defendant made an attempt to enter the burning house located across the street. The officers then decided it would be necessary to take the defendant into custody for detoxification, pursuant to ORS 426.460.[1]

Following a delay of over two hours, while the detaining officers assisted in traffic and crowd control at the scene of the fire, defendant was transported to the Umatilla County Jail and "booked" as a "friendly drunk" at approximately 6 a.m. No criminal charges were filed at that time, and defendant was told he would be released within six hours or as soon as he was "sober." Defendant, however, was questioned at that time about how and why he had come to be in the vicinity of the fire in an apparent attempt to determine whether others might also have been in the area. During the course of this initial interrogation, in which defendant admitted having been inside the house and having lit at least one match therein sometime before the outbreak of the fire, defendant was found to be in possession of a considerable amount of money; additional questioning directed at ascertaining the source of these funds followed a "*Miranda* warning"[2] by Officer Anderson.

Defendant was next questioned by Officer Walker of the Pendleton police at approximately 8:30 a.m., subsequent to the discovery that the morning's fire had

---

[1] "Any person who is intoxicated or under the influence of narcotic or other dangerous drugs in a public place may be taken or sent to his home or to a treatment facility by the police. However, if the person is incapacitated, his health appears to be in immediate danger, or the police have reasonable cause to believe the person is dangerous to himself or to any other person, he shall be taken by the police to an appropriate treatment facility * * *." ORS 426.460(1).

[2] Miranda v. Arizona, 384 US 436, 86 S Ct 1602, 14 L Ed 2d 694, 10 ALR3d 974 (1966).

caused the deaths of two unidentified persons. Apparently, due to defendant's continued intoxication, this questioning, which followed a second *Miranda* warning, yielded little additional information about events surrounding the fire although defendant unequivocally denied that he had started the fire.

Shortly after the conclusion of Officer Walker's interview Pendleton Police Chief Gallaher contacted a deputy district attorney for the purpose of securing authorization to detain the defendant as a "material witness." Based upon information that the defendant had been picked up near the fire on a detoxification "charge," had been in the house or close to it at the time of the fire's outbreak, and was both in possession of a large sum of money and a stranger to the area, Deputy District Attorney Swint concluded that such a hold would be warranted[9] and at approximately 9 a.m. May 25 defendant's custody report classification was altered from "detox" to "material witness."

Later that same day an attorney retained by defendant's aunt for the purpose of determining the reason or reasons for his incarceration met with State Officer Howland at the scene of the fire and was informed of the "material witness" hold. Officer Howland also indicated to the attorney that the defendant was not a suspect in the arson investigation then underway and volunteered to provide notice of any change in his status should it occur. Some 90 minutes after this exchange—at approximately 2:30 p.m.— Howland himself had an opportunity to speak with the defendant and was told "somewhat the same" story previously given to the Pendleton police.

[9] Mr. Swint conceded at the hearing below that at the time Chief Gallaher made the request for a "material witness hold" he had not read, and was not familiar with, ORS 136.607 through 136.615 setting forth the conditions under which an individual may be so detained.

No further questioning of the defendant took place until the following afternoon when, because his previous statements had been found to be not entirely consistent with physical evidence then available, Officer Howland returned with Detective Carey of the Umatilla County Sheriff's Office in an attempt to "fill in" defendant's narrative of the events leading up to the fire and his actions after its outbreak. In this interview, *not* preceded by any *Miranda* warning, defendant reiterated that while he had been present inside the house prior to the fire and had lit at least one match during that time, he had subsequently fallen asleep in the living room and remained unaware of the presence of any fire until being waked by a "slamming door" at a time when the house was already smoke filled.

Two days later, May 28, 1974, defendant was interviewed for the fifth time, the questioning being conducted by Officer Howland together with Officers Ritter and Mink of the Oregon State Police. In the course of this interrogation—initiated by a review of defendant's *Miranda* rights—defendant conceded that he had not previously been entirely candid and that the fire might have inadvertently been started by any one of several matches he had discarded while in the house.

Two separate interrogations followed on the 29th. The first, conducted by Officers Mink and Ritter at 10:01 a.m., was preceded by another *Miranda* warning and resulted in an admission by the defendant that after discovering the fire he had, while attempting to put it out, mistakenly poured some kind of an accelerant onto the flames.

At approximately 4:15 that afternoon Officer Howland once again encountered the attorney retained by defendant's aunt. At that time he apparently informed the attorney that defendant had, in fact, be-

come a "focal suspect," but that he would be released from custody within a matter of hours. Immediately thereafter, Howland—along with Officer Mink and Detective Carey—proceeded to interrogate the defendant for another 90 minutes, during which time defendant admitted that he had been present in the house prior to the fire, had used lighted matches to make his way around in the dark, had dropped what he believed to be a "burned out" book of matches on the floor; that within a matter of minutes of dropping those matches he left the premises, walked across the street, looked back to see flames inside the home, returned to the site, grabbed a can from the porch with the intent of using its contents to extinguish the fire, *and* that he had continued to apply liquid from that can even after discovering it to be an accelerant rather than water. At the conclusion of this interview defendant was arrested and charged.

On August 2, 1974 a motion to suppress "[a]ny fact, matter or thing whatsoever arising from, discovered or derived by reason of the defendant's illegal incarceration during the period of May 25, 1974, through and including May 29, 1974"—including all statements elicited by police during that prearrest interval—was filed in the Circuit Court for Umatilla County.

Defendant there argued (1) that because the first two interrogations of early May 25 were conducted while he was "extremely under the influence of intoxicating liquor" they were carried out in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution and Art I, § 12 of the Oregon Constitution, and (2) that the following five interrogations were also conducted without due process in violation of those constitutional provisions protecting him from self-discrimination in that they

"* * * were conducted * * * while defend-

ant was illegally incarcerated as a material witness, having not been advised of the statutory rights of an individual incarcerated as a material witness, and further that the self incriminating statements obtained as a result of said interrogations were induced through suggestion and promises of help of interrogating officers, mental and physical coercion through repeated sessions of interrogation, confrontation of a polygraph examination and the threat of continued illegal incommunicado incarceration, and not pursuant to a free, voluntary and knowledgeable waiver of such rights."

An order denying defendant's motion "in its entirety" was entered by the circuit court on September 10, 1974; accompanying that order were specific findings of fact and conclusions of law which included the following:

## "FINDINGS OF FACT:

"* * * * *

"4. The defendant was taken into custody for detoxification purposes, ultimately lodged in the Umatilla County Jail. At the time of booking in the Umatilla County Jail and considering his presence at the scene of the fire the defendant was interrogated by City Police officers as to any knowledge which he may have had concerning the fire. At these questionings, 'Miranda' warnings were given to the defendant, the defendant understood those rights, freely and voluntarily waived those rights, freely and voluntarily conversed with the police officers involved.

"* * * * *

"6. At approximately 9.00 a.m. on May 25, 1974, the defendant's status of being held for detoxification was changed to being held as a 'material witness', which was within two to three hours after being booked on the detoxification hold. This 'material witness' status was relative to the

investigation of a possible arson and the death of two persons at the above described residence.

"* * * * *

"9. There is no 'treatment facility' in Umatilla County as provided in ORS 426.460 and the defendant was therefore lodged in the Umatilla County Jail in lieu thereof.

"* * * * *

"13. The defendant was not a suspect of any criminal activity while he was being held pursuant to the detoxification statute above.

"* * * * *

"15. There was no evidence that the defendant was interrogated at unreasonable hours or for unreasonable periods of time; there was no evidence that he was denied adequate sleep or food or denied any request that he had made.

"16. The defendant was advised of his 'Miranda' rights after he became a suspect, understood those rights and freely, knowingly waived those rights and freely and voluntarily conversed with police officers questioning him.

"* * * * *

"CONCLUSIONS OF LAW:

"* * * * *

"5. The 'Miranda' warnings given during the detoxification stages of the defendant's detention were not required, because the defendant was not then a suspect of any criminal activity.

"6. The defendant's intoxication was not sufficient under the test of *State v. Robinson,* 3 Or App 200 (1970) to prevent their admissibility.

"* * * * *

"8. Defendant's detention as a material witness was valid and in accord with the legislative intent of ORS 136.607 through 136.615.

"* * * * * "

■ Because, as defendant correctly points out, the state is precluded from making use of evidence it has obtained through the exploitation of an illegal arrest or detention—*Brown v. Illinois*, 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975); *Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963); *State v. Jones*, 248 Or 428, 435 P2d 317 (1967) —the threshold question in this case is the legality of defendant's detention prior to his arrest on May 29, 1974.

If in taking defendant into custody—initially for purposes of detoxification and then as a material witness—the police in this case acted within existing constitutional limits upon their authority, the admissibility of the statements defendant seeks to suppress will depend solely upon our determination of whether he (1) was properly apprised of his rights while detained, and (2) otherwise provided the statements "voluntarily." If, however, defendant's detention—in whole or in part—is found to have been "illegal," it will become necessary for us to next determine whether the statements at issue were "tainted" by that illegality and thus inadmissible as the "fruit of the poisonous tree," or the products of "an intervening independent act" sufficient to "dissipate the taint," making them at least potentially available for use by the state.

Any intoxicated person present in a public place who "is incapacitated * * * or [who] the police have reasonable cause to believe * * * is dangerous to himself or to any other person * * * shall be taken by the police to an appropriate treatment facility * * *."[④] Where no such "appropriate treatment facility"[⑤] is available an intoxicated person "may

---

[④] *See* ORS 426.460(1), n 1, supra.

[⑤]

"As used in ORS 426.450 to 426.460 * * *

be taken to the city or county jail where he may be held until he is no longer intoxicated * * * or incapacitated." ORS 426.460(3).

While conceding that he might properly have been taken into custody as "incapacitated" and—after attempting to enter the burning building—"dangerous to himself" on the morning of May 25, 1974, defendant argues here that his detention for detoxification at the Umatilla County Jail was inconsistent with the terms of ORS 426.460 and thus illegal due to the "availability" of at least two "appropriate treatment facilit[ies]" in the Pendleton area.

■ Although both the Eastern Oregon State Hospital, which "conducts detoxification and is approved by the Mental Health Division," and the Eastern Oregon Alcoholism Foundation, which "provides residential care," are, in fact, actually located in Pendleton, the record before us suggests that these facilities are *not,* contrary to defendant's argument, available to the Pendleton police as institutions upon which they may rely, as a routine matter, for the detoxification of "incapacitated" or "dangerous" citizens. Cross-examination of Corporal Moore regarding the procedures to be followed by Pendleton police in "detoxification" cases produced the following dialogue:

"Q  Is the only place to take these individuals for detoxification the Umatilla County jail?

"A  It is."

This testimony, uncontradicted by any other evidence in the record, adequately supports the circuit court's finding that defendant was lodged in the Uma-

"* * * * *

"(10) 'Other treatment facility' includes outpatient facilities, inpatient facilities and such other facilities as the [mental health] division determines suitable * * *." ORS 430.306(10).

tilla County Jail "in lieu" of a "treatment facility." Defendant's detention from 6 a.m. to 9 a.m. on May 25 thus resulted from the proper exercise of authority granted by the terms of ORS 426.460 and was, therefore, "legal."

Three additional arguments are made in support of the view that statements made prior to the initiation of the material witness hold should be suppressed as evidence: (1) The terms of ORS 426.460(6), making "[t]he records of a patient at a treatment facility * * *" confidential,[6] render all statements made to a police officer by one detained for detoxification inadmissible; (2) defendant was not "timely" advised of his *Miranda* rights; and (3) defendant was, once admonished, incapable of effectively waiving his constitutional rights due to his "highly intoxicated" state.

■■ Assuming without deciding that an individual held for detoxification at a city or county jail is to be accorded the same rights guaranteed those treated at an "appropriate treatment facility," we find defendant's reliance upon ORS 426.460(6) to be misplaced. Seemingly intended to protect an individual from the wide range of adverse consequences which might result from the public disclosure of records chronicling his detention and treatment as an "alcoholic" or "addict," we do not interpret the statute—which by its own terms permits disclosure of the fact of such detention where the interests of parents, guardians, or the patient himself would be best protected

---

[6]
"The records of a patient at a treatment facility shall not be revealed to any person other than the director and staff of the treatment facility without the consent of the patient. A patient's request that no disclosure be made of his admission to a treatment facility shall be honored unless he is incapacitated or disclosure of his admission is required by ORS 426.450 or by subsection (4) of this section." ORS 426.460(6).

by such notice[7]—as endowing an individual with the discretion to withhold otherwise admissible statements made to law enforcement personnel in the course of such detention and treatment. The statute is not designed to enlarge the Fifth Amendment rights of those subjected to questioning by police officers while undergoing a program of detoxification; those rights remain protected by the established rule that in order to be admissible statements resulting from custodial interrogations must be shown to have been voluntarily made following an appropriate warning of the individual's right to remain silent and to have counsel present.

The circuit court made the specific factual findings that at the time defendant was taken into custody for detoxification purposes he was interrogated by police officers "as to any knowledge which he may have had concerning the fire," *and* that "[a]t these questionings, 'Miranda' warnings were given to the defendant, the defendant understood those rights, freely and voluntarily waived those rights, freely and voluntarily conversed with the police officers involved." The court concluded as a matter of law that because the defendant was not a suspect of criminal activity during the detoxification stages of his detention, *Miranda* warnings were not a prerequisite to questioning by the police during that interval.

Neither the testimony of Officers Moore and Anderson nor the video tape of the interrogation conducted by them on the morning of May 25 provides a basis for the court's finding that the initial questioning was, in fact, preceded by a *Miranda* warning. That evidence unequivocally shows defendant to have been questioned at length about his presence at the scene of the fire before the warning—which followed

---

[7] *See* ORS 426.460(6), n 6, supra, 426.460(4), and 426.450.

the discovery of a large sum of money on his person —was given. Were the circuit court correct in concluding that no such warning is required where one subjected to custodial interrogation is not a "suspect" in a criminal case, the omission in this case would be of little consequence since it is conceded that at the time he was "booked" for detoxification defendant was not suspected of having violated any law. The conclusion of the court below is, however, inconsistent with guidelines provided by the United States Supreme Court.

The court first ruled in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966), that "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant" (384 US at 444) may be used by the prosecution only where "procedural safeguards effective to secure the privilege against self-incrimination" (384 US at 444) have been employed. The court specifically pointed out that

> "* * * [b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action *in any significant way* * * *." (Footnote omitted.) (Emphasis supplied.) 384 US at 444.

In *Mathis v. United States*, 391 US 1, 88 S Ct 1503, 20 L Ed 2d 381 (1968), the defendant had been convicted in United States District Court for knowingly filing false income tax refund claims. That conviction rested in part on evidence consisting of incriminating documents and oral statements obtained from him by an Internal Revenue agent while the defendant was incarcerated by the state of Florida as the result of a conviction on an unrelated charge. Because no appropriate "warning" had preceded the questioning by the IRS agent, defendant argued that the

statements elicited should not have been admissible as evidence in the subsequent prosecution, relying exclusively on the court's holding in *Miranda*. The government sought to avoid application of the *Miranda* rule on two grounds: (1) that the defendant had been questioned as part of a routine tax investigation where no criminal proceedings might have been brought, and (2) that the defendant had not been put in jail by the officer questioning him but was there for an entirely separate offense.

Dismissing these distinctions as "minor and shadowy" the court reversed, noting:

> "The Government also seeks to narrow the scope of the *Miranda* holding by making it applicable only to questioning one who is 'in custody' in connection with the very case under investigation. There is no substance to such a distinction, and in effect it goes against the whole purpose of the *Miranda* decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody. In speaking of 'custody' the language of the *Miranda* opinion is clear and unequivocal:
>
> > " '* * * [W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.' 384 U.S., at 478." 391 US at 4-5.

■■ Where, as here, an individual is actually taken into custody and necessarily exposed to "the compulsion inherent in custodial surroundings" (384 US at 458), he must, in order to be permitted a full opportunity to exercise his privilege against self-incrimination, be "adequately and effectively" apprised of his

rights prior to *any* questioning by police.[9] The absence of any appropriate warning at the outset of the interrogation at 6 a.m. on May 25 requires the suppression of statements elicited prior to Anderson's recitation of the defendant's *Miranda* rights some 10 to 15 minutes into the questioning.

With regard to those statements obtained following the warnings by both Officer Anderson and Officer Walker during the morning of the 25th, defendant argues that they too should be suppressed on the grounds that his consent to continue answering questions did not result—could not have resulted—from a "knowing and intelligent" waiver of his right to remain silent and was, therefore, involuntary, due to his continuing "highly intoxicated" state.

The trial court relied principally upon our decision in *State v. Robinson,* 3 Or App 200, 206, 473 P2d 152 (1970), in deciding whether defendant's intoxication presented a reason for suppressing his statements. That decision is applicable but even more so is *State v. William D. Smith,* 4 Or App 130, 134, 476 P2d 802 (1970), where this court noted that:

"The fact that an individual has been drinking, or even the fact that he has been drinking to the extent that he is under the influence of intoxicants, does not necessarily mean that he cannot understand advice and cannot be bound by his subsequent conduct in electing to waive the rights of which he is advised. However, if by reason of *extreme* intoxication a confession cannot be said to be the product of a rational intellect and a free will, it is not admissible. *State v. Lowry,* 245 Or 565, 423 P2d 172 (1967); *Collins v. Sullivan,* [319 F Supp 184 (D Or 1970)]; *Gladden v. Unsworth,* 396 F2d 373, 380 (9th Cir 1968)."

---

[9] *See also* Clutchette v. Procunier, 497 F2d 809, 823 (9th Cir 1974).

The question before the circuit court was, then, whether defendant's intoxication at the times he was advised of his *Miranda* rights by Anderson and Walker on the 25th was so extreme that the "waiver" of those rights was not "the product of a rational intellect and a free will, * * *" i.e., whether defendant was capable of "understanding" his rights as explained to him and chose to speak voluntarily.

The scope of our review in these cases, set out in *Ball v. Gladden,* 250 Or 485, 487-88, 443 P2d 621 (1968), is well established:

"What actually transpired is a question of fact for the trial court or jury. *If the evidence sustains such historical factual findings they will not be disturbed by [the appellate court.]* If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion, e.g., voluntariness or lack thereof, made by the trial court or jury. Whether these historical facts as found are sufficient to sustain a finding of voluntariness which meets state and federal constitutional concepts of due process is another question, and one which falls within our proper scope of appellate review. * * * In other words, we are not bound by a trial judge or jury's finding of voluntariness if we believe the historical facts upon which such finding is based are insufficient to meet constitutional standards of due process * * *." (Emphasis supplied.)

The circuit court made the "factual" finding that during the three-hour interval defendant was detained for detoxification he "understood * * * [and] freely and voluntarily waived [his *Miranda*] rights, freely and voluntarily conversed with the police officers involved"; the court then concluded as a matter of law that defendant's intoxication had not been

sufficient to prevent his statements from being admissible.

It may be argued that the testimony of Officers Anderson and Walker[9] together with the circuit court's

---

[9] Officer Anderson's testimony included the following observations regarding defendant's condition at the time of the initial interview at the Umatilla County Jail:

"Q [By prosecutor:] When was the last time that you observed him at the jail approximately?

"A Oh, I don't know. It must have been close to 7:00 o'clock, I guess, there abouts. I am not really sure.

"Q At that time was the defendant still intoxicated in your opinion?

"A Yes, he was.

"Q Did he appear to understand what was being said to him?

"A Well, not really, no.

"Q During that period of time was he advised of his so called Miranda rights?

"A Yes, he was.

"Q In what fashion, sir?

"A Well, in the room where we were at, the booking room, there is a painted sign on the wall of the Miranda rights, which I read to him and he I guess I suppose read along with me. I pointed it out to him. *He indicated that he did understand.*

"* * * * *

"Q [By defense counsel:] Officer Anderson, you indicated that at the time that you were at the jail he was still intoxicated. Was he able to navigate at all?

"A Well, he could walk but, I mean, he was definitely under the influence of alcohol.

"* * * * *

"Q Now, you indicated that when you were reading the Miranda warnings from the painted sign on the wall, was it your testimony that he read those with you?

"A Yes. He was looking at the sign when I read it to him and he did indicate that he understood them. I don't know if he did or didn't read them.

"* * * * *

"Q Was he coherent?

"A Well, he did a lot of double talking. If you would ask him a question, he would give you two or three answers.

viewing of video tapes of their interviews with the defendant provides "evidence" upon which the court may have relied in finding, as a "historical fact" that defendant "understood" the *Miranda* warnings ultimately given during the morning of May 25.

However, although we may look at that evidence in the light most favorable to this argument, we nevertheless find Officer Anderson saying (*see* n 9) that defendant did "not really" appear to understand what was being said to him but that when the *Miranda* rights were read to him, "He indicated that he did understand." This must be interpreted to mean that Officer Anderson really did not believe defendant when he indicated he understood. Officer Walker testified defendant was "visually intoxicated * * * falling asleep when I was first talking to him * * * he looked like he was intoxicated." From these observations of the officers who saw and smelled defendant at the crucial time, it is difficult for us to conclude that defendant then was in any way lucid. And this is a "historical fact" which, under *Ball v. Gladden,* supra, we must review for constitutional sufficiency.

Assuming, arguendo, that the circuit judge's conclusion and not ours is correct in this regard, we would still be confronted with the legal fact that if defendant could understand his *Miranda* rights, there was cogent reason for him to be forthwith released.

---

He really wasn't what you would call coherent, I guess." (Emphasis supplied.)

When asked whether the defendant had been intoxicated at the time of his interview at approximately 8:30 a.m. on the 25th, Officer Walker testified:

"I would say he was. He was intoxicated. I could smell it. He smelled intoxicated. Looking at him, he looked like he was visually intoxicated. He had the problem of falling asleep when I was first talking to him. I don't know if he was on dope or pills or anything like that, but to me he looked like he was intoxicated."

This is because at that time his physical condition was the only reason the officers gave for holding defendant in jail, and ORS 426.460(3) dictates under such circumstances "he may be held [in jail] *until* he is no longer intoxicated * * * or incapacitated." (Emphasis supplied.) He was not released, which is another reason for inferring he was not in mental shape to understand."

■ We conclude that as a historical fact until the "detoxification" hold was changed to "material witness" defendant could not understand the *Miranda* warnings, and statements elicited during that time should have been suppressed.

At approximately 9 a.m. on May 25 defendant's detention status was officially altered from "detox" to "material witness"; that detention continued until the late afternoon of May 29 when defendant was finally arrested. Alleging that authorities did not in effecting this continued incarceration act in accordance with the terms of ORS 136.607 through 136.615—setting out the conditions under which an individual may be "commit[ted] to the jail of the county" as a material witness—defendant argues that statements derived throughout that "illegal" imprisonment should be suppressed as "the fruit of the poisonous tree" under the authority of *Wong Sun v. United States,* supra.

■ ORS 136.607 et seq. provide that a *court or magistrate* may order a material witness to enter into "a written undertaking with sufficient sureties and in such sum as * * * [deemed] proper to the effect that such person will appear and testify on behalf of the state * * *." If compliance is refused the court may then "commit [that witness] to the jail of the county until he complies or is legally discharged." Read together, ORS 136.607 and 136.609(1) authorize the entry of such orders—by a magistrate or a judge of

the circuit court—at the time (1) a complaint or information has been filed, (2) a defendant has been arraigned upon an indictment in circuit court, or (3) a defendant has been held to answer to the grand jury following a preliminary hearing.[10] Detention for the purpose of insuring a "witness'" appearance at judicial proceedings is thus specifically provided for. Detention in aid of an investigation would not, however, appear to be authorized.

Material witness statutes such as ORS 136.607 et seq. are common in the United States. *See* compilation in appendix, Carlson, *Material Witnesses,* 55 Iowa L Rev 1, 20 (1969). In *People ex rel. Van Der Beek v. McCloskey,* 18 App Div 2d 205, 208, 238 NYS2d 676 (1963), interpreting a statute similar to that enacted here, the New York court said: "* * * [S]ince the statute is harsh and results in a restraint and interference with personal liberty, there must be a strict compliance with its provisions * * *." The court specially noted that the statute can be abused if "used as

[10]

"A magistrate may, *at the time a complaint is made or information laid before him, or* a judge of the circuit court, *at the time of the arraignment of a defendant in a criminal action* upon indictment, may, on motion of the district attorney, require each person deemed to be a material witness on behalf of the state to give a written undertaking with sufficient sureties and in such sum as the magistrate or judge deems proper to the effect that such person will appear and testify on behalf of the state at the trial of the defendant or at the examination of the charge, as the case may be." (Emphasis supplied.) ORS 136.607.

"When the magistrate has reason to believe *at the time of the holding the defendant to answer* that any of the material witnesses examined before him on behalf of the state will not appear and testify at the court to which such defendant is held to answer unless security therefor is given, he may require such witness to enter into a written undertaking with such sureties and in such sum as he deems proper for the appearance of such witness at the court to which the defendant is held to answer." (Emphasis supplied.) ORS 136.609(1).

a ruse to interrogate or hold a prospective defendant * * *," and said, "* * * The competency of any statements obtained from such a witness, who subsequently becomes a defendant, has been questioned * * *." 18 App Div 2d at 210. In *United States v. Denno*, 309 F2d 543, 544 (2d Cir 1962), *cert denied* 372 US 938 (1963), the court said that:

"* * * The [material witness] statute requires a criminal action or proceeding to be pending in some New York court. Otherwise the fixing of bail and alternative imprisonment is unauthorized and void. [Citing two New York cases.] Mere pendency of an investigation in the district attorney's office is insufficient. [Citing three New York cases.] * * *

"* * * * *

"* * * [T]he extensive possibilities for abuse of personal liberty make necessary the requirement forcibly stated by the New York cases cited above of *strict compliance* with the statutory provision * * *." (Emphasis supplied.)

*See also* Comments, 40 Neb L Rev 504, 510 (1961). We see no less reason for strict compliance with the Oregon statute than that imposed in New York.

■ No one had been charged with any crime related to the fire of the 25th at the time defendant was detained as a material witness. Neither did the commitment order originate with a magistrate or judge as required. Whether a magistrate was actually available or not during the four days defendant was detained is irrelevant to the question of the legality of defendant's incarceration as a material witness.[①] As

---

[①] Conceding that the terms of the material witness statutes had not been strictly complied with in this case, the circuit court concluded nonetheless that:

"* * * * *

"Defendant's detention as a material witness was valid and in accord with the legislative intent of ORS 136.607 through 136.615.

noted by amicus in this case, "Expediency is no substitute for law." Absent the specific grant of authority embodied in ORS 136.607 through 136.615 the state lacks the power to infringe upon the rights of an individual by "detaining" him as a material witness; strict compliance with the limited procedure provided for in those statutes is, as noted above, required. Because that procedure was not, in fact, followed in this case, defendant's detention as a material witness was "illegal."

As the state has pointed out, however, the effective protection of an individual's constitutional rights does not always require the suppression of all statements secured from a defendant while illegally detained. As the Supreme Court noted in *Wong Sun*:

"* * * [N]ot * * * all evidence is 'fruit of the poisonous tree' simply because it would not have to come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959) * * *." 371 US at 487-88.

The ultimate question in a case such as this is, then, whether the "connection" between the primary illegality and the statements by the defendant requires suppression or was so "attenuated" as to permit the introduction of them by the state.

---

"The non-judicial day of May 25, 1974 through May 28, 1974 provide valid reason for not taking the defendant before a magistrate during that period of time * * *.

"The totality of the circumstances justified the defendant's being held as a material witness of the crimes under investigation by the police at the times he was so held.

"* * * * *."

In the course of holding that a *Miranda* warning will not, standing alone, "break the causal chain" between an illegal arrest and all postwarning statements so as to make them admissible where they are otherwise voluntary in the traditional sense, the Supreme Court noted in *Brown v. Illinois,* supra, 422 US at 603-04, that:

> "* * * The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, see *Johnson v. Louisiana,* 406 U.S. 356, 365 (1972), *and, particularly the purpose and flagrancy of the official misconduct are all relevant * * *.*" (Footnotes omitted.) (Emphasis supplied.)

The United States Court of Appeals for the Ninth Circuit has pointed out that a proper analysis of a "poisonous fruit" problem involving a confession must take into account two interrelated goals:

> "* * * preventing the admission into evidence of statements made under the 'oppressive circumstances' surrounding an illegal arrest which are likely to overcome the arrestee's 'free will' (371 U.S. at 486 n. 12, 83 S.Ct. 407), and * * * curtailing arrests found to be in violation of the Fourth Amendment by denying the officers the fruits thereof." *Allen v. Cupp,* 426 F2d 756, 758 (9th Cir 1970).

Factors cited in *Allen* as relevant in determining whether any given statement made during an illegal detention is "sufficiently an act of free will" to be

admissible included: (1) the mode of arrest, (2) the manner of custody, and (3) the manner employed in exacting the confession. The Oregon Supreme Court noted in *State v. Jones,* 248 Or 428, 435 P2d 317 (1967), that the causal connection between an illegal arrest and the obtaining of evidence alleged to be the "fruit" of that illegality may be broken by (1) an intervening legal arrest, (2) the intervention of several days' time during which the defendant is released from custody, or (3) the appearance of the defendant before a magistrate between the time of illegal arrest and confession.

■ Where, as here, a defendant is interrogated on five occasions over a four-day period of illegal detention—during which time his contact with others is limited to the authorities responsible for his detention[12]—initiated for the purpose of securing statements from that defendant,[13] we are satisfied that the suppression of statements elicited during that detention is necessary and appropriate. Although the circuit court concluded that defendant had "freely and voluntarily" conversed with officers while held as a material witness, that court obviously did not—having held as a preliminary matter that defendant's detention as a material witness was legal—specifically consider whether the connection between what we have found to be an illegal detention and the statements sought to be suppressed had " 'become so attenuated as to dissipate the taint.' " *Wong Sun v. United States,* supra, 371 US at 491. Where violation of Fourth Amendment rights by the state has been

[12] Uncontradicted evidence introduced below established that until at least the afternoon of May 26, 1974 an unsigned notice on the "prisoner's board" of the Umatilla County Jail directed jail personnel to allow defendant no phone calls and no visitors.

[13] Lieutenant Mink of the Oregon State Police, officer in charge of the arson investigation in this case, testified that the "debriefing" of the defendant was, in fact, the purpose behind his detention as a material witness.

"flagrant" rather than "technical,"[19] such attenuation must be established by the clear weight of evidence. The record before us is, when measured against that standard, inadequate as a basis for concluding that defendant's acquiescence to the interrogations intermittently conducted during his detention as a material witness was the product of a "free will" untainted by the official misconduct of those responsible for his incarceration.

Taking into consideration both the acknowledged purpose of defendant's detention and the conditions of his confinement during that interval, we conclude that as the "fruit of the poisonous tree" all statements elicited from defendant on May 25, 1974 and through 6:15 p.m. on May 29, 1974 should not have been available for use as evidence in this case.

Reversed and remanded for a new trial.

---

[19] *See* Mr. Justice Powell's concurring opinion in Brown v. Illinois, 422 US 590, 606, 95 S Ct 2254, 45 L Ed 2d 416 (1975).