Argued August 21, affirmed September 10, reconsideration denied
October 15, petition for review denied November 4, 1975

## STATE OF OREGON, *Respondent, v.* SUSAN AMY COBB (No. 15-893), *Appellant.*

539 P2d 1140

*Robert C. Cannon,* Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*Janet A. Metcalf,* Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FOLEY and FORT, Judges.

FOLEY, J.

Defendant, convicted of unauthorized use of a vehicle, ORS 164.135, appeals. She contends that certain incriminating statements made by her must be suppressed because she was in custody when a police officer began questioning her prior to giving *Miranda*[①] warnings.

The facts were initially developed at a pretrial suppression hearing. On September 13, 1974, Washington County Deputy Sheriff Delbert Konschu was monitoring traffic with a radar unit when he clocked a motor vehicle at 86 miles per hour. Konschu pulled onto the highway, turning on his overhead lights and siren. As Konschu approached the vehicle, it accelerated. The ensuing chase attained speeds of over 100 miles per hour. Deputy Konschu finally stopped the car when it spun out on a corner. Lawrence Hill was in the driver's seat of the automobile; defendant sat on the front passenger side. Deputy Konschu ordered Hill and defendant out of the car, at gunpoint, searched them, walked them to the rear of the car and asked Hill for his driver's license. According to Konschu, as Hill pulled the driver's license out of his wallet and handed it over, he said, "You will know who I am. I am hot." It later developed that Hill was wanted. Konschu told Hill he was under arrest for attempting to elude a police officer. The deputy's radio was not

---

[①] Miranda v. Arizona, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

working, so he was unable to make contact with his dispatcher. Konschu related his version of subsequent events:

"I advised [defendant] that I was detaining her at that particular time.

"Q Did you arrest her at that particular time?

"A No. I had no charge at that particular time.

"Q Then what did you do?

"A I placed Mr. Hill in the patrol vehicle. I asked Miss Cobb for identification and finally got —I believe it was a library card.

"Q Did you search the vehicle at the scene?

"A Yes. I placed her in the patrol vehicle and I put out flares to the rear of us at the corner and I searched the vehicle. I found no weapons. I found no narcotics, but I could not find the registration for the vehicle.

"Q So in response to not finding that, what did you do?

"A I went back to the car and asked whose vehicle it was.

"Q To whom did you direct that question?

"A To either one of them. I said, 'Whose vehicle is it?' As if I was talking to you or somebody else. Whose is it? Is it yours? They indicated that they had stolen it.

"Q Exactly how did they do that?

"A He said, 'I ripped it off'. And she said, 'We ripped it off.' And at that particular time, I realized that we have got something else here, so I advised them of their rights."

On cross-examination at the pretrial hearing

Konschu amplified his explanation of the detention of defendant:

"Q * * * [Y]ou told [defendant] that she was being detained?

"A Yes.

"Q What do you mean by being detained.

"A I put her in custody. I detained her until I can [sic] be sure what was happening. My radio was dead. I had no idea what I had. No way of proving what I had so I detained her until I could prove what I had by getting on the radio to my dispatch.

"Q She wasn't free to leave then, was she?

"A No, she was not.

"Q And subsequent to that time and before she was given any rights you directed a question at both of them, something to the effect, whose car is this?

"A That is right."

The basic holding of *Miranda* is that

"* * * the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. * * *" (Footnote omitted.) 384 US at 444.

*See, e.g., State v. Lloyd*, 22 Or App 254, 538 P2d 1278 (1975).

However, the *Miranda* decision provides certain

types of investigatory questioning are permissible without *Miranda* warnings.

"\* \* \* General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the factfinding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." (F o o t n o t e omitted.) 384 US at 477-78.

The trial court found that the police's questioning involved such on-the-scene investigation.

■■ The state is correct in urging that any findings of fact made by the trial court and supported by the evidence should not be disturbed on appeal. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968). Yet the trial court's determination that the police's questioning involved on-the-scene investigation constitutes a conclusion of law rather than a finding of fact. The facts, regarding the situation existing at the time Deputy Konschu asked about the vehicle's ownership, are basically undisputed. After a high-speed chase, defendant was ordered out of a car at gunpoint. She was searched. Her companion was arrested. She was told she was being detained and she was placed in a police car. We conclude that she was in custody at that point. Several Oregon cases classifying questions as constituting on-the-scene investigations have impliedly included a determination that the individual was not in custody; they therefore do not apply here. *See State v. Travis,* 250 Or 213, 441 P2d 597 (1968); *State v. Taylor,* 249 Or 268, 437 P2d 853 (1968); and *State v. Crossen,* 10 Or App 442, 499 P2d 1357, Sup Ct *review denied* (1972).

This does not end our inquiry. In *State v. Whitlow,*

13 Or App 607, 510 P2d 1354, Sup Ct *review denied* (1973), the defendant was arrested, then was asked for his name. He remained silent. This was testified to over a *Miranda* objection. In upholding the admissibility of the testimony, we said:

"McCormick, Evidence 327, 329, § 152 (hornbook series 2d ed 1972), states:

" 'A statement obtained without giving the *Miranda* warnings and according the defendant the prescribed rights is inadmissible only if it is the result of "questioning" or "interrogation." * * * Where the police action is merely routine gathering of information to be used for standard administrative purposes, the warnings have not been required because the police action was neither intended nor reasonably likely to elicit incriminating information * * *.' (Footnote citing authorities omitted.)

We characterize the question the officer asked as being for a 'standard administrative purpose' because the defendant was under arrest and was going to be booked when he was taken to the police station. The first question in booking would be to learn defendant's name. It was not interrogation in the sense the defendant would have us attribute to it." 13 Or App at 612-13.

In connection with the problems of custody-police field investigation, McCormick states:

"The problems of defining custody and interrogation converge in the inquiry as to the applicability of *Miranda* to police field investigations. In *Miranda* the court stated that 'general on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. . . . In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.' But the extent of this

exception is not at all clear. Generally, the decisions have supported the right of officers to ask questions in the field without first administering the *Miranda* warning; the fact that there has been at least a limited restriction of freedom of movement is usually ignored." (Footnotes omitted.) McCormick, Evidence 330, § 152 (hornbook series, 2d ed 1972).

McCormick goes on to note that routine "administrative" interrogation can frequently include the question of ownership of automobiles:

"* * * Routine police work frequently involves requiring a driver who is being interviewed for some unrelated reason to respond to questions directed at ownership of the vehicle he is driving. In view of the routine and relatively administrative nature of this inquiry, it alone should not require the warnings." (Footnote omitted.) McCormick, Evidence, supra at 330-31.

The question asked by Deputy Konschu may, in other circumstances, be construed differently, but in the present case we deem it to be of a "routine and relatively administrative nature," particularly in light of his failure to find the automobile registration. Thus, in spite of our conclusion that defendant was in custody, we hold that the question did not constitute interrogation requiring the giving of *Miranda* warnings. The trial court did not err in refusing to suppress defendant's response to Deputy Konschu's initial inquiry.

Affirmed.