# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
November 16, 2000 Session

## STATE OF TENNESSEE  v.  TIMOTHY WALTON

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Dyer County**
**No. C97-205    Hon. R. Lee Moore, Jr., Judge**

---

**No. W1998-00329-SC-R11-CD - Filed March 15, 2001**

---

The primary issue in this case is whether the appellee was subjected to custodial interrogation in violation of the requirements of Miranda v. Arizona, 384 U.S. 436 (1966), when officers questioned him in response to his volunteered, but unwarned, statements.  The Dyer County Circuit Court found that although the appellee was placed in custody, his statements to the police as to the location of stolen property were spontaneous, voluntary, and not the result of interrogation.  The appellee then entered a conditional guilty plea, reserving for appeal the question of whether he was subjected to custodial interrogation.  The Court of Criminal Appeals reversed, finding that the greater weight of the evidence established that the appellee's statements were a result of interrogation, and it suppressed the appellee's statements and the physical evidence derived from his statements.  The State then requested permission to appeal to this Court on the issue of whether the appellee was subjected to custodial interrogation in violation of Miranda.  We agree with the intermediate court that the appellee was placed in custody and subjected to interrogation, but we decline to suppress the physical evidence recovered by the officers absent any evidence that his statements were the product of actual coercion.  Because the appellee's plea was made with the expectation that his statements were admissible as evidence, we remand this case to the Dyer County Circuit Court to give the appellee the opportunity to withdraw his plea should he so desire.

### Tenn. R. App. P. 11 Application for Permission to Appeal; Judgment of the Court of Criminal Appeals Affirmed in Part, Reversed in Part; Case Remanded

WILLIAM M. BARKER, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., and FRANK F. DROWOTA, III, and JANICE M. HOLDER, JJ., joined.  ADOLPHO A. BIRCH, JR., J., filed a concurring/dissenting opinion.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Mark E. Davidson, Assistant Attorney General, Nashville, Tennessee, for the appellant, State of Tennessee.

Charles S. Kelly, Dyersburg, Tennessee, for the appellee, Timothy Walton.

**OPINION**

**FACTUAL BACKGROUND**

On May 22, 1997, two federal postal inspectors and three officers with the Dyer County Sheriff's Department went to the home of the appellee, Timothy Walton, to discuss recent post-office burglaries in Finley, Tennessee. The inspectors apparently believed the appellee either participated in the burglaries or otherwise possessed relevant information. Upon arriving at the appellee's residence in three separate police cars, both postal inspectors and two of the officers approached the appellee, who was on his porch. The third officer, Officer Burns, then went behind the trailer, ostensibly to "secure the rear of the house for the officer's safety." While in the back yard, Burns noticed a path leading from the trailer into the woods, and following it, he discovered a small clearing containing about ten or fifteen marijuana plants. Burns also discovered several propane heaters located not far from the appellee's property.

Officer Burns returned to the trailer and notified the other officers and the postal inspectors of his discovery, and one of the officers and both postal inspectors went to inspect the plants and heaters. The appellee, who denied ownership of the plants or heaters, remained near the trailer with Officer Johnson, "talking with him." At some point while the other officers were photographing the scene and "recovering [the] evidence," Johnson requested that the appellee accompany the officers and the postal inspectors to the sheriff's department to further discuss the Finley post-office burglaries. The appellee agreed to go, and although the officers informed him that he was not under arrest for the marijuana or for any other crime, Johnson handcuffed the appellee and placed him in the back of Officer McCreight's unmarked patrol car. Apparently, the purpose of handcuffing the appellee was for the officers' security, as the patrol car was not equipped with a security cage.

Although the record is unclear as to precisely when the statements were made, at some point the appellee mentioned the name of a Charles Thompson, who apparently informed the police of the appellee's role in the post-office burglaries, and said "I know what lies and things that [Thompson has been] telling on me. And I've got some information where we can get him."[1] About the time that the parties prepared to go back to the sheriff's department, the appellee claimed to know the location of several stolen items that Thompson had given him "from some other places." Upon hearing this, Johnson then asked the appellee whether he could show the property to the officers, and the appellee responded, "Yes, I'll take you to it right now."

Once in the patrol car with Officers Johnson and McCreight, the appellee gave the officers directions to a point along a public road where a piece of plastic had been tied to a barbed wire fence.

---

[1] According to the testimony at the suppression hearing, none of the officers ever told the appellee that Thompson informed the police of the appellee's role in the burglaries. The State, in its brief before this Court, twice concedes that Thompson was the unidentified police informant.

The appellee told the officers to stop, and the officers allowed him, with his handcuffs still on, to get out of the car and venture about thirty feet down into a ravine. The appellee returned a few minutes later carrying a plastic garbage bag containing a computer, a monitor, and a keyboard. The officers, who later testified that they had no knowledge of a stolen computer before the appellee brought it to them, placed the items in the trunk of the patrol car.

At this point, the appellee then told the officers that he knew where more property was located, and he gave the officers directions to his parents' house. Once they arrived at the house, Johnson asked, "Which way do we go from here?" The appellee responded, "Just follow me," and he took the officers into a barn where, with his handcuffs still on, he started to remove some floorboards. Johnson asked him to stop for a moment while McCreight took some pictures of the scene. When the appellee was permitted to resume, he uncovered a rifle wrapped in a pair of blue coveralls. After first holding the wrapped rifle in the air so that McCreight could take another picture, the appellee handed the rifle to Officer Johnson, who recognized it as one reported stolen from a residence in Finley. Knowing that the stolen rifle also had a scope, Johnson then asked the appellee whether "there was anything else to go with [the rifle]," to which the appellee responded that the scope to the rifle was back at his house.

The trio then returned to the appellee's residence, and the appellee invited the officers into his house and back to his bedroom. With the handcuffs still on, the appellee went to his bedroom closet, from which he produced the rifle scope for the officers. Apparently without any other prodding, he also produced from the closet several electric heaters and a step ladder, all items that the police later determined were stolen from the Dyersburg Warehouse. The officers then proceeded to take the appellee and all of the property back to the police station. As they were leaving, Officer Johnson told the appellee's wife that the appellee was not under arrest.

Once at the police station, the officers informed the appellee for the first time of his right to remain silent and of his right to have an attorney present. Despite the fact that Officer McCreight was aware that the appellee was illiterate, McCreight also requested that the appellee sign and date a form labeled "Admonition and Waiver," which contained a written statement of his Miranda rights and a waiver of those rights. After signing the form, the appellee gave a statement that detailed the dealings of Charles Thompson and another individual, Billy McNeely, in obtaining the stolen property. According to Officer Johnson, though, the appellee never stated that "he had anything to with [this] at all."

On August 11, 1997, the Dyer County Grand Jury returned a four-count indictment against the appellee, charging him with two counts of theft over five hundred dollars, one count of burglary, and one count of aggravated burglary. Two months later, the appellee filed a motion to suppress any statements and evidence resulting from the failure of the officers to inform the appellee of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). A hearing on the motion was held on December 18, 1997, during which the State introduced the testimony of Officers Burns, McCreight, and Johnson. The State argued that no Miranda warnings were needed in this case because the appellee was never placed in actual custody and because the appellee had spontaneously volunteered all of

the information to the police without first having been questioned. Although the appellee introduced no proof himself, he argued that the police "intimidated, urged, coaxed, coerced, questioned, and interrogated" him into revealing the location of other stolen property, and that notwithstanding the officers' testimony, it was "inconceivable that the officers . . . did not ask any questions whatsoever." His counsel maintained that his incriminating statements were neither voluntary nor spontaneous.

On January 5, 1998, the trial court issued a "Memorandum Opinion and Order on Motion of Defendant to Suppress," denying the appellee's motion. The court disagreed with the State that the appellee was not placed in custody, because "[v]iewing this matter under the totality of the circumstances, . . . a reasonable person in the suspect's position would have considered himself deprived of freedom of movement to a degree associated with a formal arrest." However, the court found no evidence that the appellee was ever subjected to interrogation while he was in custody. As the court stated in its Memorandum Opinion,

> [t]he only testimony available to the court for consideration is the testimony of the three officers mentioned above. . . . Officer McCreight and Investigator Johnson testified that there was no interrogation and that all of the information given by the defendant was spontaneous and voluntary and not elicited as a result of any interrogation or suggestion by either officer. Consequently, although the . . . defendant was in custody at the time the information was obtained, . . . the information was given voluntarily by the defendant and not in response to interrogation by either officer. The need for formal Miranda warnings presumes that the statements are elicited through interrogation or questioning.

On February 6, 1998, the appellee entered a conditional guilty plea to the burglary and aggravated burglary counts of the indictments, reserving for appeal a certified question of law regarding the court's denial of his motion to suppress. The trial court then sentenced the appellee to three years imprisonment for the burglary conviction and to four years imprisonment for the aggravated burglary conviction, both sentences to be served concurrently in the Department of Correction.

The Court of Criminal Appeals reversed the decision of the trial court. Although the intermediate court agreed that the appellee was placed in custody, it also found that "[t]he greater weight of the evidence does not support the conclusions made by the trial court that the statements were admissible because they were spontaneously made." The court stated that "[w]hile the statements may have been voluntary, [they] were not made by the defendant with the full knowledge of his rights," and that "the 'coercive nature' of the arrest produced the incriminating information." The Court of Criminal Appeals then suppressed all of the evidence against the appellee and dismissed the charges.

The State then filed an application for permission to appeal before this Court on the sole issue of whether, as a matter of law, the appellee was subjected to interrogation within the meaning of

-4-

Miranda v. Arizona. We granted the State's application,[2] and we agree with the Court of Criminal Appeals that the appellee was placed in custody and subjected to interrogation. We also find, however, that while any statements made by the appellee in response to interrogation are automatically suppressed, the physical evidence recovered by the officers is properly admissible absent any evidence that the appellee's statements were the product of actual coercion.

## STANDARD OF APPELLATE REVIEW

This case involves a review of the trial court's findings of fact and conclusions of law in denying a motion to suppress evidence. Because issues of whether a defendant was placed in custody, interrogated, or voluntarily gave a confession are primarily issues of fact, see State v. Morris, 24 S.W.3d 788, 805 (Tenn. 2000); State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996); Childs v. State, 584 S.W.2d 783, 786-87 (Tenn. 1979), we review these factual determinations by the trial court according to the standard set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Odom, 928 S.W.2d at 23.[3] Questions about witness credibility and "resolution of conflicts in the evidence are matters entrusted to the trial judge," id., and the "[t]estimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress." State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). Our review of a trial court's application of law to the facts, however, is conducted under a *de novo* standard of review. See State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

## CUSTODIAL INTERROGATION

The issues in this case involve the constitutional protection against compelled self-incrimination, which "is protected by both the federal and state constitutions." State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000). The Self-Incrimination Clause of the Fifth Amendment to the United States Constitution, made applicable to the states by Mallory v. Hogan, 378 U.S. 1, 6 (1964), provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Our state constitution likewise contains a related provision in Article I, section 9, which guarantees that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Although "we have traditionally interpreted article I, [section] 9 to be no broader than the Fifth Amendment," State v. Martin, 950 S.W.2d 20, 23 (Tenn. 1997), one "significant difference between these two provisions is that the test of voluntariness for confessions under Article

---

[2] Oral argument was heard in this case on November 16, 2000 in Jackson, Madison County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

[3] We note that some cases from the intermediate court still refer to the standard in place prior to Odom for reviewing a trial court's findings of fact at a suppression hearing. See, e.g., State v. Green, 995 S.W.2d 591, 599 (Tenn. Crim. App. 1998) ("The findings of fact of the trial court on issues concerning the making of a custodial statement are binding upon appellate review if there is any evidence in the record to support them."). To be clear, the standard of appellate review for findings of fact at a suppression hearing is that articulated by this Court in Odom.

I, [section] 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment," State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992) (citing State v. Smith, 834 S.W.2d 915 (Tenn. 1992)).

To help insure the protections of the Fifth Amendment in the criminal process, the United States Supreme Court held in Miranda v. Arizona, 384 U.S. 436, 444 (1966), that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." As part of these safeguards, the police are required to inform persons being questioned while in custody of the following rights: (1) that they have the right to remain silent; (2) that any statement made may be used as evidence against them; (3) that they have the right to the presence of an attorney during questioning; and (4) that if they cannot afford an attorney, one will be appointed for them prior to questioning, if so desired. See id. at 444; see also State v. Bush, 942 S.W.2d 489, 499 (Tenn. 1997). As the Supreme Court recently re-emphasized, "Miranda and its progeny . . . govern the admissibility of statements made during custodial interrogation in both state and federal courts." Dickerson v. United States, 530 U.S. 428, __ (2000).

The requirements of Miranda "must be strictly enforced, but only in those situations in which the concerns that motivated the decision are implicated." State v. Goss, 995 S.W.2d 617, 629 (Tenn. Crim. App. 1998) (citing Illinois v. Perkins, 496 U.S. 294, 296 (1990)). Of course, Miranda warnings are not required under every circumstance in which police officers come into contact with citizens. Rather, because "[t]he underpinnings of Miranda are to dissipate the compulsion inherent in custodial interrogations, to prevent coerced self-incrimination, and to prevent relevant defendant ignorance," see State v. Callahan, 979 S.W.2d 577, 582 (Tenn. 1998), the requirements of Miranda come into play only when the defendant is in custody and is subjected to questioning or its functional equivalent, see Rhode Island v. Innis, 446 U.S. 291 (1980). Absent either one of these prerequisites, the requirements of Miranda are not implicated.

With regard to the issue of custody, the Miranda Court defined this requirement as when the defendant is placed under formal arrest or is "otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444; see also Stansbury v. California, 511 U.S. 318, 322 (1994) ("[T]he ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."). This Court has expanded this definition to mean "under the totality of the circumstances, [whether] a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996). To aid in determining whether a reasonable person would consider himself or herself in custody, this Court considers a variety of factors, including the following:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during

the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Anderson, 937 S.W.2d at 855.

In this case, the State concedes, and we agree, that the lower courts were correct in finding that the appellee was "in custody" for Miranda purposes. We first note that the appellee was confined in the backseat of a patrol car with two other officers present. Cf. State v. Preston, 411 A.2d 402, 405 (Me. 1980) (finding custody when defendant was questioned alone in an unmarked police car by two other officers). Second, we note that while the appellee voluntarily agreed to go to the police station with the officers, the officers nevertheless handcuffed the appellee before he got into the car, and he remained handcuffed during the entire afternoon as the officers drove around the county. Although one of the officers testified that the handcuffs were used only for security purposes while the appellee was in the patrol car, this conclusion is not credible given that the handcuffs were not removed even when the appellee was out of the car searching and digging for stolen items.[4] Viewing this matter in the totality of the circumstances, therefore, we conclude that a reasonable person in the appellee's position would have considered himself or herself deprived of freedom of movement to a degree associated with formal arrest.

The next issue in this case is whether the appellee was subjected to interrogation while he was in custody. Although the Miranda Court defined interrogation as "questioning initiated by law enforcement officers," 384 U.S. at 444, the Supreme Court has since made clear that interrogation is not limited to express questioning by officers. In Rhode Island v. Innis, 446 U.S. 291, 301 (1980), the Court stated that interrogation "refers not only express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit incriminating information." Included within this definition is any "practice that the police should know is likely to evoke an incriminating response from a suspect." Id.

The present case is unlike those usually applying the Innis rationale, however, because it does not involve subtle police tactics designed to elicit incriminating responses; rather, it involves direct, express questioning of the appellee by police officers. The rub in this case, though, is that the

---

[4] We believe that this crucial fact distinguishes this case from our holding in Childs v. State, 584 S.W.2d 783 (Tenn. 1979), in which we found that a defendant was not questioned while "in custody," even though he was questioned by officers while he was voluntarily accompanying police officers to the station in the back of a police car. Unlike the present case, though, the Childs defendant had voluntarily visited the police station previously on several occasions, and he was not handcuffed during this particular journey.

questions by the officers were follow-up questions to the defendant's initial voluntary statements.[5] The genuine issue in this case, therefore, is whether a defendant is subjected to interrogation when he or she initially volunteers a statement to police officers and is then asked follow-up questions by the officers concerning that initial voluntary statement.

"The bare fact of custody may not in every instance require a warning even when the suspect is aware that he is speaking to an official . . . ." Illinois v. Perkins, 496 U.S. 292, 299 (1990) (dicta). Nevertheless, because its proscription on express questioning without the Miranda safeguards is unqualified, the Innis definition of interrogation appears, upon first reading, to exclude from evidence all answers to express questioning while the defendant is in custody. No case has ever extended the holding of Innis this far, however, and several types of express questions have been permitted by state and federal courts when (1) the questions do not infringe upon "the underpinnings of Miranda," or (2) those underpinnings are outweighed by other concerns. For example, officers are permitted to ask questions that reveal non-testimonial information, see, e.g., Pennsylvania v. Muniz, 469 U.S. 582, 591-92 (1990) (permitting questions that were designed to reveal non-testimonial evidence such as slurred speech); United States v. Dionisio, 410 U.S. 1 (1973) (permitting voice exemplars), and officers may ask questions relevant to routine booking procedures at the police station, Muniz, 569 U.S. at 601-02; see also State v. Williams, 623 S.W.2d 118, 121 (Tenn. Crim. App. 1981) (stating that Miranda does not apply to routine questions such as "the subject's name, address, date of birth, height, weight, location of arrest and charge").[6] In addition, the Supreme Court has upheld the questioning of a defendant when the questioning was necessary to prevent a threat to public safety. See New York v. Quarles, 467 U.S. 649 (1984).

The United States Supreme Court has yet to specifically address whether follow-up questions by officers to a defendant's voluntary statements are permitted, especially when the officers have

---

[5] Although it seems exceedingly unlikely that the appellee suddenly volunteered to share his knowledge of the whereabouts of stolen property without any prodding or questioning by the officers, there is no proof in the record to the contrary. The only witnesses at the suppression hearing were the police officers, who all testified that the appellee volunteered the information on his own, without any "carrot" being given or offered by the police. With no proof or evidence to the contrary, the trial court's finding that the appellee's initial statements were voluntary is certainly in accord with the weight of the evidence, and as such, we are bound by this finding on appeal.

[6] The Muniz Court stated that asking questions during routine booking procedures did in fact amount to custodial interrogation. 496 U.S. at 601 ("We disagree with the Commonwealth's contention that Officer Hosterman's first seven questions regarding Muniz's name, address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation as we defined the term in Innis, merely because the questions were not intended to elicit information for investigatory purposes."). However, so long as the questions were not designed to elicit incriminating information, id. at 602 n.14, the answers to those questions were admissible under the "routine booking question" exception, "which exempts from Miranda's coverage questions to secure the 'biographical data necessary to complete booking or pretrial services,'" id. at 601.

In State v. Cobb, 539 P.2d 1140 (Ore. Ct. App. 1975), the Oregon Court of Appeals recognized that while a question may be of a "routine and relatively administrative nature" in one case, the very same question could constitute "interrogation" in another case. The key difference for that court was whether the police action was either intended or reasonably likely to elicit incriminating information. Id. at 1143 (citing McCormick, Evidence § 152, at 327, 329 (2d ed. 1972)).

reason to suspect that the answers to the follow-up questions are likely to be incriminating. Some courts addressing this issue have held that the answers to follow-up questions are merely a continuation of the defendant's initial voluntary statement. For example, the Nebraska Court of Appeals has held that because follow-up questions by officers to a defendant's voluntary statement are not prohibited by Rhode Island v. Innis, such questions are permitted, and the answers are admissible. See State v. McDowell, 488 N.W.2d 593, 597-98 (Neb. Ct. App. 1992) ("However, the record does show that after [the defendant] made a statement to Murtaugh, Brady then asked [the defendant] if there was something he wanted to say. Innis does not prohibit such follow[-]up questions. Therefore, [the defendant's] answer to Brady's question was a continuation of his volunteered statement, and the officers were not required to advise him of his Miranda rights at that time.").

The greater weight of authority, however, seems to suggest that officers should inform the suspect of his or her Miranda rights before asking follow-up questions to a voluntary statement when the officers "reasonably suspect" that incriminating information will be forthcoming. One court addressing this issue has stated that

> a person who volunteers facially exculpatory information to the police and whom the police do not have reason to consider a suspect, may, without being advised of his Miranda rights, be asked follow-up questions so long as those questions are designed to clarify the facially exculpatory prior statement. *However, once the police have reason to doubt the information, and thus to believe that any further questions would be "reasonably likely to elicit an incriminating response," they must administer the Miranda warnings before [asking] any follow-up questioning.*

Merriweather v. State, 629 So.2d 77, 83-84 (Ala. Crim. App. 1993) (citations omitted) (emphasis added); see also United States v. Gonzalez, 688 F. Supp. 658, 662 (D.D.C. 1988), *remanded on other grounds*, 875 F.2d 875 (D.C. Cir. 1989) ("Miranda does not apply to unsolicited, spontaneous and voluntary statements, not made in response to interrogation, although officers must give warnings before any follow-up questioning is resumed.").

Although Innis does not directly compel such a standard, we believe that the second approach is most in line with the underpinnings of Miranda. We acknowledge that, unlike the present case before this Court, many courts addressing this issue have done so in situations in which the defendant first asserted his or her right to remain silent and then later volunteered to speak to the police. Even so, the rationale adopted by those cases seems particularly appropriate when, as in this case, the defendant never had the benefit of the warnings in the first instance. Accordingly, we conclude that police officers are permitted to ask follow-up questions to a defendant's voluntary statement without first having to give Miranda warnings, unless the officer has reason to believe that the follow-up questions are "reasonably likely to elicit an incriminating response." In such a case, Miranda warnings must be given before any answers to the follow-up questions are properly admissible. In this manner, courts can be assured that the resulting answers are truly voluntary and free from "relevant defendant ignorance." Cf. Callahan, 979 S.W.2d at 582; see also Wayne R.

LaFave, et al., Criminal Procedure § 6.7(d), at 566-57 (2d ed. 1999) ("The better view, however, is that the part of the defendant's statement given after the follow-up questions is volunteered only if the questions are neutral attempts to clarify what has already been said rather than apparent attempts to expand the scope of the statement already made.").

Turning to the facts of this case, Officer Johnson clearly had reason to believe that his follow-up questions to the appellee's statements were "reasonably likely to elicit an incriminating response." The officer had every reason to believe that the answers to his questions would lead to the recovery of stolen property, and from all indications in the record, this was precisely the officer's hope and expectation.[7] Cf. Innis, 446 U.S. at 301 n.7 (stating that the intent of the officer "may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response"). Indeed, it is difficult to conceive of any response by the appellee that would not have been incriminating, and as such, we find that the officer first had a duty to inform the appellee of his rights before asking any follow-up questions. Accordingly, we agree with the Court of Criminal Appeals that the appellee was subjected to custodial interrogation in a violation of the requirements of Miranda v. Arizona.

## SUPPRESSION OF EVIDENCE

Because we have found that the appellee in this case was subjected to custodial interrogation without first having been informed of his rights under Miranda v. Arizona, it is axiomatic that all statements made by the appellee in response to that interrogation are inadmissible as evidence. See, e.g., Miranda, 384 U.S. at 466 ("The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant."); State v. Bush, 942 S.W.2d 489, 499 (Tenn. 1997). However, the evidence of guilt in this case consists not only of statements made by the appellee, but also of physical evidence obtained from his "custodial expedition for incriminating evidence."[8] In vacating the appellee's plea and dismissing the charges, the Court of Criminal Appeals suppressed all of the evidence in this case, including the recovered property, finding that the failure to inform the appellee of his rights, combined with the "particular nature of [the officers'] interrogation,"

_____

[7] The fact that the location of the stolen property was derived from the express questioning of Officer Johnson distinguishes this case from State v. Hurley, 876 S.W.2d 57, 66 (Tenn. 1993), in which the defendant called the detective to his cell to give a full confession. The detective in Hurley testified that, upon receiving the defendant's call, he had no intention of interrogating the defendant but went to the cell only to hear what the defendant had to say. Moreover, with the exception of one inquiry as to why the defendant was being "set up" by others, the detective in Hurley did not question the defendant at all, but rather only listened to his voluntary statements. This Court held that because the defendant initiated the contact with the detective and because his voluntary self-serving statements were not in response to any questioning on the part of the detective, the defendant's statements were not the product of custodial interrogation and were therefore admissible. Hurley, 876 S.W.2d at 66.

[8] This is how the Court of Criminal Appeals adeptly characterized the appellee's afternoon journey with the officers on May 22, 1997. See State v. Walton, No. 02C01-9807-CC-00210, 1999 WL 236459, slip op. at 11 (Tenn. Crim. App. filed at Jackson April 23, 1999).

required suppression of the recovered physical evidence. We disagree, respectfully, that the record as developed in this case compels such a result.

## *FEDERAL LAW*

The United States Supreme Court has not directly addressed whether physical evidence obtained from a violation of Miranda is admissible.[9] Absent a finding that a statement was involuntary, we note that Miranda's exclusion of incriminating statements has never been absolute. See, e.g., Harris v. New York, 401 U.S. 222, 226 (1971) (permitting use of unwarned, voluntary statements to impeach a witness). Furthermore, as several cases make clear, the Fifth amendment applies only to testimonial or communicative evidence, see, e.g., Schmerber v. California, 384 U.S. 757 (1966); United States v. Dionisio, 410 U.S. 1 (1973), and as such, all non-testimonial evidence would seem to fall outside the scope of the "fruit of the poisonous tree" doctrine as applied to the Fifth Amendment.[10] Nevertheless, as the Supreme Court acknowledged in Michigan v. Tucker, 417 U.S. 433 (1974), the exclusionary rule may be applied in the Fifth Amendment context given the proper case. See 417 U.S. at 447.

While not addressing the precise issue before us today, the Supreme Court has had occasion to address whether some fruits of a Miranda violation need to be suppressed. For example, in Tucker, a defendant sought to suppress the testimony of a state witness whose identity was disclosed through unwarned statements made by the defendant during a custodial interrogation. In permitting the witness's testimony, the Court held that unwarned questioning of the defendant "did not abridge

---

[9] Such a result was suggested by Miranda itself, although Justice White's dissenting opinion made clear that the Court was leaving the issue for consideration at a later date. Compare Miranda, 384 U.S. at 479 ("But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."), with Miranda, 384 U.S. at 454 (White, J., dissenting) ("Today's decision leaves open such questions as . . . whether non-testimonial evidence introduced at trial is the fruit of statements made during a prohibited interrogation."); see also Patterson v. United States, 485 U.S. 922, 922-24 (1988) (White and Brennan, JJ., dissenting from a denial of certiorari) (noting that Miranda, Michigan v. Tucker, 417 U.S. 433 (1974), and Oregon v. Elstad, 470 U.S. 298 (1985), have all left open the question of the "admissibility of physical evidence yielded from a Miranda violation").

[10] In Schmerber v. California, the Court first hinted that only testimonial evidence may be excluded by a violation of the Fifth Amendment. In holding that the blood test evidence at issue was "not inadmissible" on privilege grounds, the Court reasoned that "although an incriminating product of compulsion, [it] was neither petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner . . . ." 384 U.S. at 765. Having decided Miranda only seven days earlier, the Court then noted that

> [t]his conclusion would not necessarily govern had the State tried to show that the accused had incriminated himself when told that he would have to be tested. Such incriminating evidence may be an unavoidable by-product of the compulsion to take the test, especially for an individual who fears the extraction or opposes it on religious grounds. If it wishes to compel persons to submit to such attempts to discover evidence, *the State may have to forgo the advantage of any testimonial products of administering the test—products which would fall within the privilege.*

Id. at 765 n.9 (emphasis added). As this statement demonstrates, the Schmerber Court believed that while a Miranda violation would render any resulting statements inadmissible, the non-testimonial evidence, such as the blood tests, could still be used as evidence of guilt notwithstanding the Miranda violation.

-11-

[the defendant's] constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by this Court in Miranda to safeguard that privilege." Tucker, 417 U.S. at 446. In answering "how sweeping the judicially imposed consequences of this disregard shall be," the Court declined to suppress the fruit of the violation, or the testimony of the State's witness, in the absence of a need to deter police conduct or a need to protect against unreliable evidence resulting from actual coercion. Id. at 447-49.

A similar rationale was later used in Oregon v. Elstad, 470 U.S. 298 (1985), in which the Court permitted a second voluntary confession to be used as evidence after the defendant's first voluntary confession was obtained in violation of Miranda. The Elstad Court stated that while the "fruit of the poisonous tree" doctrine called for suppression of evidence upon a finding of a Fourth Amendment violation, the same result did not necessarily follow when officers erred "in administering the prophylactic Miranda procedures." Elstad, 470 U.S. at 309. Unless a court finds "any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," a technical violation of Miranda "should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself."[11] Id. Finding that the first confession was given voluntarily and without any actual coercion, the Court permitted the second confession into evidence, stating that "little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." Id. at 312. Although the Elstad Court specifically declined to reach the question of whether its rationale would admit non-testimonial evidence obtained after a violation of Miranda, several lower federal courts have permitted such evidence in the absence of actual coercion.[12]

Although the Tucker and Elstad rationales have been followed by other courts, a recent decision from the United States Supreme Court has cast some doubt as to the true nature of Miranda's procedures. In Dickerson v. United States, 530 U.S. 428 (2000), the United States Supreme Court held that Miranda was a constitutional decision that could not be legislatively overruled by Congress, and at least one court has asserted that this holding significantly undermines the rationales of Tucker and Elstad to the extent that these cases would permit non-testimonial fruits of a Miranda violation. In People v. Trujillo, 2000 WL 1862933 (Colo. Ct. App. Dec. 21, 2000), the

---

[11] "Where an unwarned statement is preserved for use in situations that fall outside the sweep of the Miranda presumption, the 'primary criterion of admissibility [remains] the "old" due process voluntariness test.'" Elstad, 470 U.S. at 307-08 (quoting Stephen J. Schulhofer, Confessions and the Court, 79 Mich. L. Rev. 865, 877 (1981)).

[12] See, e.g., United States v. Crowder, 62 F.3d 782, 786 (6th Cir. 1995) (stating that "non-testimonial physical evidence, such as the shotgun, discovered due to an unwarned statement is admissible if the unwarned statement was voluntary"); United States v. Mendez, 27 F.3d 126, 130 (5th Cir. 1994) ("The derivative evidence rule operates [in the Miranda context] only when an actual constitutional violation occurs, as where a suspect confesses in response to coercion."); United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1048 (9th Cir. 1990) (admitting deportation record obtained in violation of Miranda absent coercion or a denial of due process); United States v. Bengivenga, 845 F.2d 593, 600-01 (5th Cir. 1988) (admitting bus ticket and baggage claim stubs obtained from Miranda violation); United States v. Sangineto-Miranda, 859 F.2d 1501, 1514-19 (6th Cir. 1988) (admitting contraband discovered as a result of a Miranda violation); United States v. Morales, 788 F.2d 883, 886 (2d Cir. 1986) (permitting statement obtained in violation of Miranda to be used in establishing probable cause to arrest).

Colorado Court of Appeals rejected an argument that the exclusionary rule did not apply in the Fifth Amendment context and found that <u>Dickerson</u> essentially elevated <u>Miranda</u>'s procedures to that of constitutional requirements.[13]

After carefully considering <u>Dickerson</u>, we disagree that its rationale now compels application of the exclusionary rule to non-testimonial evidence for a failure to give <u>Miranda</u> warnings. While we acknowledge that the rationales of <u>Tucker</u> and <u>Elstad</u> depended upon the fact that a violation "in administering the prophylactic <u>Miranda</u> procedures" was not, without more, a violation of the Fifth Amendment itself, <u>Dickerson</u> did not hold otherwise. Importantly, <u>Dickerson</u> did not overrule <u>Tucker</u> or <u>Elstad</u>, nor did it repudiate the reasoning adopted by these cases. In fact, <u>Dickerson</u> even approved of <u>Elstad</u>'s language concerning <u>Miranda</u>'s "prophylactic" procedures as recognition of "the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." <u>Id.</u> at __. With its express acknowledgment that the exclusionary rule operates differently under the Fifth Amendment, <u>Dickerson</u> is more properly read to reaffirm that <u>Miranda</u>'s specific procedures are still prophylactic in nature.

The reasoning adopted by the Colorado Court of Appeals in <u>Trujillo</u> seems to closely follow Justice Scalia's dissent in <u>Dickerson</u>, wherein the view was expressed that <u>Miranda</u>'s requirements are now the only measures that can satisfy constitutional concerns. Certainly if this were true, then one would be compelled to conclude that a violation of <u>Miranda</u> is also now a violation of the Fifth Amendment. We disagree, however, that such a reading naturally follows from the majority's decision, if only because this reading is contradicted by the language of the opinion itself. Not only did the majority plainly refuse to extend its holding that far,[14] but the majority also limited its decision to holding that the "totality of the circumstances" test, without more, is inadequate to protect the privilege against self-incrimination.[15] Indeed, when read in this context, <u>Dickerson</u> practically does little more than did <u>Miranda</u> itself, which, in holding that the "totality of the circumstances" test was insufficient to safeguard Fifth Amendment protections, was clear that the constitution did not require any particular set of procedures. See <u>Miranda</u>, 384 U.S. at 467 ("We

---

[13] More specifically, the Colorado Court of Appeals dismissed the issue stating that
[t]he People rely on <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), in which the Supreme Court held that <u>Miranda</u> violations, being "procedural," did not mandate application of the "fruit of the poisonous tree" analysis set forth in <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963). However, in <u>Dickerson v. United States</u>, 530 U.S. 428 (2000), the Supreme Court held that <u>Miranda</u> announced a constitutional, not a procedural rule, and specifically distinguished <u>Oregon v. Elstad</u>, on that basis. Accordingly, we conclude that the "fruit of the poisonous tree" analysis employed in <u>James v. Illinois</u>, applies here.

[14] <u>Dickerson</u>, 530 U.S. at __ ("The dissent argues that it is judicial overreaching for this Court to hold [section] 3501 unconstitutional unless we hold that the Miranda warnings are required by the Constitution, in the sense that nothing else will suffice to satisfy constitutional requirements. But we need not go farther than Miranda to decide this case.") (citation omitted).

[15] <u>Dickerson</u>, 530 U.S. at __ ("As discussed above, [section] 3501 reinstates the totality test as sufficient. Section 3501 therefore cannot be sustained if <u>Miranda</u> is to remain the law.").

-13-

cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted.").[16]

Moreover, merely recognizing that Miranda is a decision of constitutional law does not mean that a violation of the particular procedures set forth in that decision must also be a violation of the constitution itself. For example, this Court has long recognized that the Miranda decision is one of a constitutional nature, as we have repeatedly perceived ourselves to be bound by that decision. See, e.g., Shannon v. State, 221 Tenn. 412, 420, 427 S.W.2d 26, 29 (1968) (recognizing Miranda as a constitutional decision and stating that "[l]et it be noted that the concern of this Court is not to favor a defendant but to see that the scales of justice be in balance between him and the State, which cannot be if the constitutional guarantees of Miranda can be withheld by its officers"). In so recognizing, however, we have never viewed the failure to administer the Miranda warnings as an actual violation of the Fifth Amendment, which would thereby compel suppression of all the fruit of that violation. Cf. State v. Crump, 834 S.W.2d 265, 270 (Tenn. 1992) (recognizing that the mere failure to administer warnings, as opposed to a failure to honor invocation of rights, is not itself a Fifth Amendment violation); State v. Smith, 834 S.W.2d 915, 919-21 (Tenn. 1992) (admitting fruits of a Miranda violation upon a finding that the defendant's second confession was "given knowingly and voluntarily," and was not the result of "coercive tactics" or efforts "to wear down Smith's resistence and overcome his free will"). The majority's opinion in Dickerson does not now compel a different result for our cases.

Prior to Dickerson, the federal courts seem to have largely favored admitting non-testimonial evidence derived from a violation of Miranda, absent actual coercion of the defendant's statements. We do not view Dickerson as now compelling a finding that a failure to administer Miranda warnings is itself a violation of the Fifth Amendment. We also disagree that Dickerson compels the conclusion that a violation of Miranda mandates a *per se* exclusionary rule for all fruits of that violation. Accordingly, although we acknowledge that this issue has yet to be definitively settled by the United States Supreme Court, we recognize that the clear trend under the federal constitution is to admit non-testimonial evidence, so long as the statements revealing the non-testimonial evidence were not coerced.

*TENNESSEE LAW*

---

[16] In further recognition that the specific Miranda procedures themselves were not constitutionally required, the Miranda Court even invited Congress to develop alternative procedures to protect the privilege against self-incrimination. See 384 U.S. at 490 ("[T]he Constitution does not require any specific code of procedures for protecting the privilege against self-incrimination during custodial interrogation. Congress and the States are free to develop their own safeguards for the privilege, so long as they are fully as effective as those described above in informing accused persons of their right of silence and in affording a continuous opportunity to exercise it."). As it is well established that Congress is without power to define substantive constitutional rights, see City of Boerne v. Flores, 521 U.S. 507, 519 (1997), the particular warnings outlined in Miranda cannot themselves be coterminous with the Fifth Amendment. We believe that the Dickerson Court recognized this crucial fact and limited its opinion accordingly by holding simply that Congress failed to rise to the Miranda Court's challenge of issuing adequate safeguards for the protection of the Fifth Amendment.

Although this Court has expressly rejected the Tucker and Elstad rationales with regard to admission of a subsequent confession obtained after an initial unlawful confession, State v. Smith, 834 S.W.2d 915, 921 (Tenn. 1992), the same approach does not necessarily follow under Article I, section 9 of the Tennessee Constitution when the issue is admission of tangible, non-testimonial evidence. As is the case with the Fifth Amendment, Article I, section 9 is concerned only with a defendant's coerced, self-incriminating *statements*, and this provision has never been interpreted to provide a *per se* exclusion of non-testimonial evidence. See State v. Frasier, 914 S.W.2d 467, 473 (Tenn. 1996) (declining to adopt "a literal interpretation of the term 'evidence'" in Article I, section 9 by maintaining the traditional Fifth Amendment distinction between testimonial and non-testimonial evidence); Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979) ("We do not agree that the Tennessee prohibition against self-incrimination is broader or different in any application thereof because of the use of the word 'evidence' instead of the word 'witness.'"). Moreover, "[a]bsent some officially coerced self-accusation," the privilege against self-incrimination "is not violated by even the most damning admissions." State v. Williams, 623 S.W.2d 118, 121 (Tenn. Crim. App. 1981).

Indeed, courts in this state have permitted the "fruits" of a Miranda violation when the fruit is not that of a subsequent confession by the defendant. For example, in State v. Tidwell, 775 S.W.2d 379 (Tenn. Crim. App. 1989), the Court of Criminal Appeals admitted the testimony of a witness whose identity was discovered through unwarned custodial interrogation. In addressing the defendant's argument that the testimony of another witness should have been suppressed as fruit of the violation, the court stated that

> [t]he defendant's argument confuses the scope of the exclusionary rule in Fourth Amendment cases with the exclusionary rule in Fifth Amendment cases. The Fifth Amendment exclusionary rule is limited in scope to the exclusion of confessions obtained in violation of an accused's constitutional rights. *Evidence derived from an illegally obtained confession is admissible notwithstanding the confession was, or should have been, suppressed.* There is one exception to this rule. If the confession from which the evidence was derived was coerced in the due process sense, the evidence is not admissible. This exception is not applicable in the case *sub judice*.

Id. at 388 (emphasis added) (citations omitted).[17] Likewise, in State v. Kyger, 787 S.W.2d 13, 24 (Tenn. Crim. App. 1989), the Court of Criminal Appeals addressed whether a defendant's consent to provide "fingerprints, photographs, [and] handswabs" following an illegal custodial interrogation should have been suppressed. In allowing the admission of the non-testimonial evidence, the court stated that "[e]vidence derived from an uncoerced confession illegally obtained through such a [Miranda] violation may be admissible notwithstanding whether the confession was or should have been suppressed." Kyger, 787 S.W.2d at 24.

---

[17] While other cases from the Court of Criminal Appeals hold that witnesses discovered from an illegal statement should be suppressed, these cases arise in the context of a statement made following an illegal arrest in actual violation of the Fourth Amendment. See State v. Williams, 784 S.W.2d 660 (Tenn. Crim. App. 1989); State v. Story, 608 S.W.2d 599 (Tenn. Crim. App. 1980).

-15-

Although this Court has yet to address this issue with regard to non-testimonial evidence since Miranda, we have previously admitted evidence obtained from an illegal confession, even though the confession itself was excluded. In Rice v. State, 50 Tenn. (3 Heisk.) 215 (1871), the prosecutor improperly induced a defendant to reveal the location of stolen money orders, and the defendant gave a full confession revealing the location of the property. The defendant was then indicted for larceny and for knowingly receiving stolen goods with the intent to deprive the true owner thereof. In permitting the physical evidence obtained from the confession, the Court stated that "although a confession obtained by means of promises or threats cannot be received; yet if, in consequence of that confession, certain facts tending to establish the guilt of the prisoner, are made known, evidence of these facts may be received." Id. at 223. The Rice Court allowed the jury to consider "the fact of the witness having been directed by the prisoner where to find the goods, and his having found them accordingly," though it did not allow "the acknowledgment [through the confession] of the prisoner having stolen or put them there." Id. at 224-25.[18]

Given these federal and state authorities, we conclude that a *per se* exclusionary rule, which would automatically exclude non-testimonial evidence obtained from a technical failure to give Miranda warnings, is not warranted. Instead, we hold that a defendant may seek suppression of non-testimonial evidence discovered through his or her unwarned statements only when the statements are the product of an actual violation of the privilege against self-incrimination, *i.e.*, such as when actual coercion in obtaining the statement is involved or when the invocation of the right to remain silent or to have counsel present is not "scrupulously honored." Cf. State v. Crump, 834 S.W.2d 265, 270 (Tenn. 1992) (holding that a refusal to honor the right to remain silent, "by definition, is of constitutional magnitude"). In those cases in which the fruit of the violation involves the defendant's testimonial or communicative statements, however, the heightened protections of State v. Smith, 834 S.W.2d 915 (Tenn. 1992), safeguarding the privilege continue to apply with full force in this state, and our decision today should not be read as diminishing the concerns expressed by Smith in any way.

The concurring/dissenting opinion expresses the concern that allowing non-testimonial evidence represents "a gross incursion upon the letter and spirit of Miranda, and tends to invite open defiance and disregard of the Miranda doctrine by those bound to respect it . . . ." We are certainly mindful of this concern, but we disagree that today's decision will invite open defiance of Miranda. We reiterate that where law enforcement officers act in actual violation of the federal or state constitutions, their actions will bring forth heavy consequences—all "fruit" resulting from the violation, testimonial and non-testimonial together, will not be permitted to be used as evidence. The judiciary of this state will not tolerate actual police coercion, either physical or psychological, used to obtain statements from a suspect, and as has been expressed in other areas of the law, it is

<hr>

[18] As the concurring/dissenting poignantly explains, to the extent that actual coercion was involved in Rice to obtain the confession, the fruits of that confession would be inadmissible today. However, the larger point illustrated by this Court's decision in Rice is that a *per se* exclusion of all fruits of a confession has never been required by the constitution or laws of this state. To that extent, Rice lends great weight to our conclusion that Article I, section 9—which had been the law in Tennessee for three quarters of a century prior to that decision, see Tenn. Const. art. XI, § 9 (1796)—does not necessarily compel exclusion of physical evidence discovered from an unlawful confession.

not unfair "to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." See Boyce Motor Lines v. United States, 342 U.S. 337, 340 (1952). This is the price demanded for jealous protection of constitutional liberties.

*In the absence of a need to deter constitutional violations*, however, the demand for such a heavy-handed remedy is simply not as compelling, and the broad exclusionary rule advocated by the concurring/dissenting opinion will undoubtably work to penalize even legitimate law enforcement activity. In the absence of actual coercion, the price of excluding relevant, probative, and reliable evidence may be proportionally too expensive, especially when the interest of the accused is simply that of not being *compelled to testify* against himself.[19] Indeed, this view is precisely that expressed by Justice O'Connor's concurring-dissenting opinion in New York v. Quarles, 467 U.S. 649 (1984), wherein she stated that

> [t]o be sure, admission of nontestimonial evidence secured through informal custodial interrogation will reduce the incentives to enforce the Miranda code. But that fact simply begs the question of how much enforcement is appropriate. . . . *The* Miranda *decision quite practically does not express any societal interest in having those warning[s] administered for their own sake. Rather, the warnings and waiver are only required to ensure that "testimony" used against the accused at trial is voluntarily given.* Therefore, if the testimonial aspects of the accused's custodial communications are suppressed, the failure to administer the Miranda warnings should cease to be of concern. The harm caused by failure to administer Miranda warnings relates only to admission of testimonial self-incriminations, and the suppression of such incriminations should by itself produce the optimal enforcement of the Miranda rule.

New York v. Quarles, 467 U.S. at 668-69 (1984) (O'Connor, J., concurring) (emphasis added) (footnote and citations omitted); see also Tucker, 417 U.S. at 462 (White, J., concurring) ("The arguable benefits from excluding such [evidence] by way of possibly deterring police conduct that might compel admissions are, in my view, far outweighed by the advantages of having relevant and probative [evidence], not obtained by actual coercion, available at criminal trials to aid in the pursuit of truth. The same results would not necessarily obtain with respect to the fruits of involuntary confessions.").

The assumption underlying the view of the concurring/dissenting opinion is that law enforcement officers will forgo the opportunity to gain a valid, voluntary confession merely for the

---

[19] In cases involving statements following an initial unlawful confession, see State v. Smith, 834 S.W.2d 915, 921 (Tenn. 1992), the interest involved is precisely that of preventing one from being *compelled to testify* against himself. In those types of cases, therefore, the approach advocated by the concurring/ dissenting opinion is a much more practical remedy because it is designed to further the actual right at issue. As no defendant is privileged to have non-testimonial evidence excluded under the Fifth Amendment or Article I, section 9, exclusion of such evidence in the absence of a constitutional violation (1) adds very little to the accused's interest in not being compelled to testify against himself, and (2) adds significant and unnecessary barriers to the use of otherwise legitimate law enforcement practices.

sake of obtaining non-testimonial evidence of dubious probative value. As courts have recognized, however, a confession by a defendant is "like no other evidence,"[20] and the sheer power of an admission of guilt is precisely the reason that we go to extraordinary lengths to ensure that it is reliable, *i.e.*, voluntarily made without compulsion or coercion, and that it is corroborated by some other evidence. See State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000).

It is difficult to believe that law-enforcement officers would risk exclusion of a confession, the most probative and powerful evidence of guilt, merely for the possibility of obtaining other evidence of indeterminate probative value, and practically speaking, we doubt that this would ever be the case. Indeed, in this state, if the statements leading to the discovery of the physical evidence are actually coerced in any way, either physically or psychologically, then *all* of the statements and physical evidence discovered therefrom will be excluded, and the state may be without any evidence to prosecute the crime. While we are mindful of the theoretical concerns expressed by the concurring/dissenting opinion, we believe that the current framework of Miranda as developed by the courts of this state adequately prevents such concerns from becoming a reality.[21]

Turning to the facts of this case, we see no evidence of coercion by the police, either physical or psychological, in obtaining the location of the stolen property. The appellee initiated the

---

[20] See Arizona v. Fulminante, 499 U.S. 279, 296 (1991); see also Bruton v. United States, 391 U.S. 123, 139-40 (1968) (White, J., dissenting):

> [T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. Though itself an out-of-court statement, it is admitted as reliable evidence because it is an admission of guilt by the defendant and constitutes direct evidence of the facts to which it relates. Even the testimony of an eyewitness may be less reliable than the defendant's own confession. An observer may not correctly perceive, understand, or remember the acts of another, but the admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.

[21] The concurring/dissenting opinion minimizes the ability of the courts to determine when coercion has been used in obtaining statements from an accused, and in advocating its broad exclusionary rule, that opinion apparently contemplates that no incriminating statement can be the product of a free will. Even Miranda did not accord a presumption of coercion such conclusive weight, as that opinion recognized that at least some suspects will make incriminating statements voluntarily. See 384 U.S. at 478. Moreover, as was recognized by the Supreme Court in Elstad,

> There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a "guilty secret" freely given in response to an unwarned but noncoercive question, as in this case. [The] contention that it is impossible to perceive any causal distinction between this case and one involving a confession that is coerced by torture is wholly unpersuasive. . . . *It is difficult to tell with certainty what motivates a suspect to speak. A suspect's confession may be traced to factors as disparate as "a prearrest event such as a visit with a minister," or an intervening event such as the exchange of words respondent had with his father. We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.*

470 U.S. at 312-14 (footnote and citations omitted) (emphasis added).

conversation of the stolen property, and he voluntarily agreed to show the officers where the property was located. After recovering the stolen computer from the ravine, the record shows that it was the *appellee* who then asked the officers whether he could show them other property. Even while back at his own house later in the afternoon, the appellee produced several heaters and a step ladder, apparently on his own volition without any prodding or questioning by the officers. Furthermore, we can find no threats of prosecution for other offenses, nor can we find any evidence that the appellee's actions were "compelled by promises of leniency." Cf. State v. Smith, 933 S.W.2d 450, 456 (Tenn. 1996) ("The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are compelled by promises of leniency.").[22] Quite simply, we see no indication that the officers' actions represented "an effort to wear down [the appellee's] resistance and overcome his free will." Cf. Smith, 834 S.W.2d at 920.

We note that the Court of Criminal Appeals reached the opposite conclusion on this issue, finding that the totality of the circumstances indicated that the appellee was coerced into revealing the location of the stolen property. In particular, the intermediate court relied heavily upon the fact that the appellee was in custody and in handcuffs during the entire expedition. Although these facts are undisputed, we disagree that they alone converted the situation into one that was unduly coercive. As this Court has recognized, if custody were alone "sufficient to vitiate the voluntariness of a subsequent confession, an accused could never give a voluntary confession after arrest." Smith, 834 S.W.2d at 920.[23] Moreover, while the Court of Criminal Appeals also found coercion in part from the failure to administer the Miranda warnings, "[t]he failure of police to administer Miranda warnings does not mean that the statements received have actually been coerced, but only that courts will presume that the privilege against compulsory self-incrimination has not been intelligently exercised." Elstad, 470 U.S. at 310. Accordingly, viewing the matter within the totality of the circumstances, we agree with the trial court that no actual coercion was involved in this case, and we hold that the fruit of the Miranda violation, *i.e.*, the physical property recovered, need not be suppressed.

## CONCLUSION

---

[22] There is a hint throughout the appellee's pleadings in the trial court that the police had information of the stolen property and that the police agreed not to prosecute the appellee if he would help gather evidence against Charlie Thompson. While Officer Johnson testified that the officers were in fact aware of some of the stolen items, such as the rifle and scope, all of the officers denied making any statements or promises of leniency. No proof whatsoever was introduced by the appellee of these promises, and as such, we cannot say that the finding of the trial court as to the voluntariness of the appellee's statements is against the weight of the evidence.

[23] Indeed, neither the Fifth Amendment nor Article I, section 9 applies to evidence that is disclosed voluntarily and free from compulsion, even without the requisite warnings. See State v. Hurley, 876 S.W.2d 57, 66 (Tenn. 1993); see also Miranda, 384 U.S. at 478 ("The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

In summary, we hold that the appellee in this case was subjected to custodial interrogation in violation of the requirements of Miranda v. Arizona, 384 U.S. 436 (1966). As such, any statements made by the appellee in response to such interrogation are suppressed. Nevertheless, because all of the appellee's statements in this case were voluntary and not the product of actual coercion or other efforts designed to overcome his will, we hold that the physical evidence recovered as fruit of that violation need not be suppressed. The judgment of the Court of Criminal Appeals is affirmed in part and reversed in part.

In the trial court, the appellee pleaded guilty reserving a certified question of law thought by the parties and both lower courts to be dispositive of the case, and we accepted jurisdiction on this basis. However, through our analysis of, and consultation with, various legal authorities, we have determined that the Miranda violation was in fact not dispositive of the case because not all fruits of that violation need to be suppressed. See State v. Wilkes, 684 S.W.2d 663, 667 (Tenn. Crim. App. 1984) (stating that an issue is deemed to be dispositive when the appellate court "must either affirm the judgment or reverse and dismiss"). As such, we can neither affirm the judgment of the trial court as it stands, because some of the evidence considered was certainly inadmissible, nor can we reverse and dismiss the case, because the physical evidence against the appellee is properly considered as evidence of guilt.

Although we do not accept jurisdiction when the certified question is not dispositive of the case, State v. Preston, 759 S.W.2d 647, 651 (Tenn. 1988) ("If the appellate court does not agree that the certified question is dispositive, appellate review should be denied."), the non-dispositive nature of this issue did not come to light until after this Court granted permission to appeal and heard argument by the parties. Under the special circumstances of this case, especially given that the suppression issue was one of first impression for this Court, we felt it appropriate to address the issue as stated in the certification and as accepted for appeal by this Court and the Court of Criminal Appeals. See State v. Jennette, 706 S.W.2d 614, 617 (Tenn. 1986). We hasten to add, however, that this decision today in no way signals a departure from the rule that appellate review will be denied when the issues certified for review are in fact not dispositive of the case. See Tenn. R. Crim. P. 37(b)(2)(i).

As a final note, we observe that when the appellee pleaded guilty to the charges of burglary and aggravated burglary, he did so with the expectation that his statements to the police were admissible as evidence against him. Because the Miranda violation in this case requires suppression of the appellee's statements made in response to interrogation, the appellee's initial presumption concerning the evidence to be presented against him was not accurate. Consequently, in the exercise of our discretion to fashion appropriate relief under the circumstances of each individual case, see Tenn. R. App. P. 36(a), we remand this case to the Dyer County Circuit Court, giving the appellee the opportunity to withdraw his original plea should he so desire.

Costs of this appeal shall be taxed equally against the appellant, the State of Tennessee, and the appellee, Timothy Walton.

_____
WILLIAM M. BARKER, JUSTICE