FILED

07/18/2022

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 10, 2022 Session

## STATE OF TENNESSEE v. HENRY DWAYNE AUTREY

**Appeal from the Criminal Court for Putnam County**
**No. 2018-CR-779A Wesley Thomas Bray, Judge**

_____

### No. M2021-01046-CCA-R3-CD
_____

Following a traffic stop of his vehicle that yielded five packages of methamphetamine hidden inside the spare tire, the Defendant, Henry Dwayne Autrey, was indicted by the Putnam County Grand Jury for possession of more than 300 grams of methamphetamine with the intent to sell and with the intent to deliver. He filed a motion to suppress, arguing that the search of the spare tire was unconstitutional because it was conducted after the initial search of the vehicle had been completed and without sufficient probable cause. The trial court granted his motion to suppress and subsequently dismissed the indictment upon the request of the State. The State now appeals, arguing that the officers had probable cause for the search of the spare tire and did not unreasonably detain the Defendant to complete the search. We agree with the State. Accordingly, we reverse the order of the trial court granting the motion to suppress and remand for reinstatement of the indictment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR. JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Bryant Dunaway, District Attorney General; and Mark Gore, Assistant District Attorney General, for the appellant, State of Tennessee.

Brian D. Wilson, Franklin, Tennessee (on appeal) and Ben Marsee, Cookeville, Tennessee (at hearing), for the appellee, Henry Wayne Autrey.

# OPINION

## FACTS

On July 31, 2018, Troopers Adam Cothron and Douglas Foster of the Tennessee Highway Patrol's Interdiction Plus Team conducted a traffic stop of a 2000 red Honda CRV in which the Defendant was the rear seat passenger. Two other individuals were in the car with the Defendant: Co-Defendant Terry Killian, the driver, and Co-Defendant Terry Snipes, who was riding in the front passenger seat. The vehicle was registered to the Defendant's girlfriend. After seeing a folded dollar bill in the front cup holder that appeared consistent with drug use, Trooper Cothron asked to look at it, unfolded it, and found a white powder inside.

At that point, the officers patted all three men down for weapons, separated them, and began searching the vehicle. During the search of the vehicle's interior, they found a marijuana pipe and a marijuana grinder, tire tools, and a receipt from a store in California inside a bag that contained a brand-new valve stem remover. After approximately thirty-two minutes, the officers ceased their active search of the vehicle for approximately three minutes. Toward the end of that time, one of the officers asked the other if he had checked the spare tire mounted on the rear of the vehicle. The officers then removed the spare tire, cut inside it, and discovered five bags of methamphetamine. The Putnam County Grand Jury subsequently returned an indictment charging the Defendant with two counts of possession of more than 300 grams of methamphetamine with the intent to sell/deliver, Co-Defendant Snipes with possession of drug paraphernalia based on the marijuana pipe and grinder, and Co-Defendant Killian with possession of alprazolam (Xanax) based on the white powder in the folded dollar bill. Both co-defendants pled guilty to their charges prior to the suppression hearing in the instant case.

On August 5, 2019, the Defendant filed a motion to suppress the evidence uncovered during the search and the incriminating statements he made to the officers, arguing, among other things, that the search of the tire was unconstitutionally unreasonable and that his statements were the fruit of the illegal search and/or given without *Miranda* warnings.

At the September 23, 2019 suppression hearing, the parties stipulated to the admission of the dashcam video of the traffic stop, which the trial court viewed after the hearing. Trooper Adam Cothron testified that he joined the Tennessee Highway Patrol in February 2015 after six and one-half years of employment with the Trousdale County Sheriff's Department. He said he had attended several drug interdiction training classes, including a class on the use of hidden compartments to conceal drugs, and in June 2018 was assigned to the Tennessee Highway Patrol Interdiction Plus Unit in the Cookeville District, where he was partnered with Trooper Doug Foster.

Trooper Cothron testified that on July 31, 2018, he and Trooper Foster were sitting in his patrol vehicle in the median at mile marker 291 on Interstate 40 in Putnam County when he observed that the driver of a red Honda CRV with a North Carolina license plate was not wearing a seatbelt. When he caught up with the vehicle to conduct a traffic stop for the seatbelt violation, he saw that the front seat passenger was not wearing a seatbelt either. After he had pulled the vehicle over, he approached the front passenger window to talk to the driver, Co-Defendant Killian, who provided him with his North Carolina driver's license, and the front seat passenger, Co-Defendant Snipes, who handed him his parole identification card and told him that he had served eleven years in prison for attempted murder and theft. At the same time, Trooper Foster was talking to the Defendant, the rear seat passenger.

As Trooper Cothron was talking with Co-Defendants Snipes and Killian, he noticed a folded dollar bill inside a shot glass in the front cup holder that aroused his suspicions. He explained that he had twice before encountered a dollar bill folded in a similar fashion and in each instance found that it contained drugs. He, therefore, asked for and received consent to see the bill. When he unfolded it, he found that it contained a white powder. He informed Trooper Foster of what he had found, asked the co-defendants to step out, and brought them to the rear of the vehicle where Trooper Foster was engaged in conversation with the Defendant, who had already exited the vehicle. The troopers then patted the men down for weapons and separated them along the side of the interstate before beginning a search of the vehicle.

Trooper Cothron testified that Trooper Foster, who was engaged in conversation with one or more of the men, informed him that there was a marijuana pipe and grinder inside the vehicle. Trooper Cothron said he searched the front of the vehicle while Trooper Foster searched the rear cargo area. Shortly into the search, Trooper Foster found a marijuana pipe and grinder as well as tire weights, a valve stem remover, and a battery-powered impact wrench. Trooper Foster also found a receipt from a store in California.

Trooper Cothron testified that the men had previously told him that they were returning from a trip to Las Vegas but upon Trooper Foster's discovery of the California store receipt, the Defendant told them that they had also been to California. When he asked the Defendant how long they had been gone, the Defendant told him about thirty-eight hours. Trooper Cothron testified that the initially undisclosed information that the men had been to California, combined with the new tire tools and the quick turnaround, increased his suspicions. He explained that he knew that California was a "source state" for all kinds of drugs, particularly methamphetamine, cocaine, and marijuana, and that drug traffickers typically engage in "quick turnarounds and fast trips."

Trooper Cothron testified that after he and Trooper Foster had conducted a thorough search of the interior of the vehicle, their attention was drawn to the spare tire because of the brand-new, still-in-its-original-packaging valve stem remover, impact wrench, and the "pretty good number of tire weights" in the rear cargo area of the vehicle, which he described as "unusual." He recalled that he and Trooper Foster had a conversation in which Trooper Foster asked if he had checked the spare tire. When he replied that he had not, Trooper Foster walked up to the spare tire, which was mounted on the rear door of the vehicle, hit it a few times, and told Trooper Cothron that the bottom portion was "hard" and felt different from the rest of the tire.

Trooper Cothron testified that he then used the impact wrench to remove the tire from the vehicle. The tire had an "unusual wobble" when it hit the ground and, as he rolled it back and forth, Trooper Cothron could "feel and hear something inside the tire that shouldn't be there[.]" He told Trooper Foster that he felt something in the tire and Trooper Foster, in turn, rolled the tire on the pavement before confirming that he also felt something inside it. Trooper Cothron then brought the tire to the front of his patrol vehicle, let the air out, cut the valve stem off, and cut into the tire, where he found five cellophane-wrapped packages of "a crystal like substance" that was later confirmed to be methamphetamine.

Trooper Cothron testified that when he first began to remove the spare tire from the vehicle, Co-Defendant Snipes began waving his hand and yelling that he needed an ambulance. After he had removed the tire and realized that something was inside it, he and Trooper Foster handcuffed the three men because their demeanor had changed and it was obvious that "things were becoming more intense[.]" At that time, Trooper Foster "read Miranda rights to [the Defendant] and Mr. Killian simultaneously." As Trooper Cothron began to let the air out of the tire, the Defendant motioned him over and said, "[H]ey, the tire is loaded, I don't know what's in it." He asked the Defendant if it was loaded with something he had gotten in California and the Defendant replied "yes."

Based on his review of the dashcam video of the traffic stop, Trooper Cothron estimated that the total duration of the search of the vehicle, from the start of the search until the discovery of methamphetamine, was approximately forty to forty-five minutes.

On cross-examination, Trooper Cothron acknowledged that the initial search was based on the powder he found inside the dollar bill and that he and Trooper Foster conducted a thorough search of the vehicle prior to his removal of the spare tire. He further acknowledged that he had never before found contraband hidden inside a tire and that nothing prevented him from applying for a search warrant for the tire.

Trooper Douglas Foster testified that he attended Walter State Police Academy in 2010 and the Highway Patrol Training Academy in 2014. Since that time, he had received

- 4 -

"hundreds of hours of training in criminal interdiction[,]" which included specific training in hidden compartments used to transport drugs. He said that when Trooper Cothron pulled behind the red CRV, he saw a lot of movement inside the vehicle, particularly from the Defendant, the backseat passenger. As he and Trooper Cothron walked up behind the vehicle, the Defendant raised his hands in the air, which in his experience indicated "someone that has experience that have been involved with law enforcement in the past." The Defendant was wearing a waistband key chain with a marijuana leaf on it, immediately lit a cigarette, and "wouldn't stop talking[,]" interfering with Trooper Cothron's "handl[ing of] the traffic stop."

Trooper Foster testified that he asked the Defendant to step out of the vehicle for the officers' safety due to the Defendant's excessive movement inside the vehicle, his demeanor, and his "answering all the questions for the driver and the passenger" which Trooper Foster found to be an "odd" response to a traffic stop based on a seatbelt violation that did not involve the Defendant.

Trooper Foster testified that the Defendant got out of the vehicle and came to the front of the patrol vehicle, where he questioned him about his marijuana use and the Defendant responded that he did not use marijuana. At about that time, Trooper Cothron informed Trooper Foster of the white powder he had found. After the troopers had patted everyone down and separated them, Co-Defendant Snipes told Trooper Foster that he had a marijuana pipe and grinder in the vehicle. Trooper Foster informed Trooper Cothron of what he had learned and then began talking to the Defendant, who told him that there was nothing illegal inside the vehicle.

According to Trooper Foster, the Defendant "was very cooperative[,]" volunteered that the officers could search anywhere they liked, and even opened up the rear cargo door for Trooper Foster to search. Trooper Foster testified that he noticed "a large number of . . . decorative skulls and trinkets" and asked the Defendant about them. He said the Defendant told him he could "smash the skulls and look for contraband." However, he did not hear anything inside the skulls when he shook them.

Trooper Foster testified that he found the marijuana pipe and grinder at the beginning of his search of the rear cargo area. He also found in the rear cargo area a grocery store bag with a California store receipt and a brand-new valve stem remover inside. He found an impact wrench with an attached lug nut socket in the area inside the rear cargo compartment "where another spare tire could have been" stored and a number of tire weights inside the rear passenger side door pocket. The California store receipt was inconsistent with what the men had told the officers about having been on a gambling trip to Las Vegas and when he pointed it out to Trooper Cothron, the Defendant volunteered that they had also been to California.

Trooper Foster testified that after searching all the areas inside the vehicle and climbing underneath, he walked back to Trooper Cothron and asked him if he had checked the spare tire. Trooper Cothron replied that he had not yet done so, and Trooper Foster walked back to the vehicle and "beat on the tire all the way around[.]" When he reached the bottom portion, he heard a "different thud" from the rest of the tire. He told Trooper Cothron that he believed there was something inside the tire, and Trooper Cothron picked up the impact wrench and began removing the tire. As soon as Trooper Cothron began the tire removal, Co-Defendant Snipes "fell over and said he was having some kind of medical emergency." The Defendant, on the other hand, volunteered to hold the lug nuts as Trooper Cothron removed them.

Trooper Foster testified that Trooper Cothron bounced the tire on the pavement a few times and announced that there was something inside it. Trooper Cothron asked him to check it as well, and he heard something moving inside the tire after he rolled it on the ground a few times. He said they asked the Defendant what was inside the tire but he did not respond. They then handcuffed the men and read them their rights. At that point, the Defendant motioned Trooper Cothron over and told him that the tire was "loaded." Trooper Cothron let the air out of the tire, cut into it, and found the five bags of methamphetamine.

On cross-examination, Trooper Foster acknowledged that he and Trooper Cothron had each been members of the Interdiction Plus Team for approximately a month at the time of the traffic stop. He disagreed that his specialized drug interdiction training dated only from the time he joined the Interdiction Plus Team, testifying that he had been "doing criminal interdiction since 2010" as a "canine handler" and had attended a number of courses over the years, including a week-long "extensive criminal interdiction training" course in Nashville in 2016 and a week-long course on the Texas border in 2017 where he was taught "how to find concealment methods, hidden traps, and things of that nature." He acknowledged that as a member of the Interdiction Plus Team he was always looking "beyond the ticket" for indicators of criminal activity. He said that Trooper Cothron did not begin the search until after Co-Defendant Snipes revealed that there was a marijuana pipe and grinder inside the vehicle. However, the troopers pulled everyone out of the vehicle based on Trooper Cothron's discovery of the white powder and he assumed Trooper Cothron would have searched the vehicle on that basis alone. He acknowledged that the Defendant's consent for him to search the vehicle was not reflected on the video, as only Trooper Cothron was wearing a belt microphone that day. He further acknowledged that he had never before found contraband inside a tire but stated that he had seen it "in training."

On redirect examination, Trooper Foster testified that there were indicators throughout the stop that the men were engaged in criminal activity, beginning with the

Defendant's unusual movements and behavior inside the vehicle and including the troopers' discovery of the white powder, drug paraphernalia, California receipt, tire tools and tire weights; the fact that the Defendant did not mention the trip to California until they found the receipt; and Co-Defendant Snipes' feigned health crisis when Trooper Cothron began to remove the spare tire.

On August 12, 2021, the trial court entered an order granting the Defendant's motion to suppress the methamphetamine and the Defendant's incriminating statements about the contents of the spare tire. At the beginning of its order, the trial court stated that its "findings of fact [were] based primarily on its review of the video." The trial court noted that Trooper Foster's testimony that he found the impact wrench in the spare tire storage compartment was inconsistent with the dashcam video, which reflected that he found the wrench before he lifted the compartment lid. The trial court further noted that the Defendant's consent to search was not reflected on either the dashcam video or the belt microphone worn by Trooper Cothron. The trial court, therefore, found that it could "not credit" Trooper Foster's testimony that the Defendant gave consent for the search. The trial court found that Trooper Foster had not been intentionally deceptive but that the video showed that his "memory of events was demonstrably wrong[.]"

The trial court further found: that the officers had probable cause to search the vehicle based on their discovery of the white powder and drug paraphernalia; that the officers had completed their search of the vehicle approximately three minutes before they began their search of the spare tire; that the officers lacked probable cause for a continuation of the search or for a separate search of the spare tire; and that the officers unreasonably extended the duration of the stop in order to search the spare tire which had, at best, only a tenuous nexus to the officers' initial suspicion that the men "might have concealed personal use amounts of drugs somewhere in the vehicle." The trial court found that the statements the Defendant made after he was given *Miranda* warnings were tainted by the illegal search. In the alternative, the trial court "also f[ou]nd that, at the point the tire was removed from the vehicle and the troopers developed their specific suspicion that it contained contraband, rather than destroying the tire, they should have immediately sought a warrant to search it."

The State announced that it was unable to proceed with the prosecution of the case due to the trial court's ruling and requested that the court dismiss the indictment. On September 10, 2021, the trial court dismissed the indictment. That same day, the State filed a notice of appeal to this court challenging the trial court's ruling.

## ANALYSIS

The State contends that the trial court erred in granting the Defendant's motion to suppress, arguing that the scope and duration of the officers' search was reasonable under the circumstances, in which the officers had probable cause to search the entire vehicle based on the discovery of the white powder and the drug paraphernalia and "just over 30 minutes elapsed between the discovery of the marijuana [sic] and the search of the spare tire." The State disagrees that the officers had completed their search of the entire vehicle before they examined the spare tire, arguing that the video shows that the officers "merely paused the search and reasonably resumed it three minutes later."

The Defendant argues that the trial court correctly concluded that the original search was completed when the officers "stopped actively investigating the vehicle, and that probable cause had dissipated before the troopers began to search the vehicle anew." The Defendant further argues that the search of the spare tire did not fall under the automobile exception to the warrant requirement because the troopers "did not have probable cause to start their search anew" once they had completed their original search and stepped away from the vehicle for several minutes.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom,* 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. *See id.* However, "when a trial court's finding of fact at a suppression hearing are based on evidence that does not involve issues of credibility, a reviewing court must examine the evidence de novo without a presumption of correctness." *State v. Binnette*, 33 S.W. 3d 215, 218 (Tenn. 2000) (footnote omitted). The application of the law to the facts found by the trial court is a question of law and is reviewed de novo. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the United States and Tennessee constitutions prohibit unreasonable searches and seizures. U.S. Const. amend IV; Tenn. Const. art. I, § 7. Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Yeargan*, 958 S.W.2d at 630. "Under both

constitutional guarantees, reasonableness is 'the ultimate touchstone.'" *State v. Stanfield*, 554 S.W.3d 1, 9 (Tenn. 2018) (citations omitted). The State has the burden to demonstrate, by a preponderance of the evidence, that a warrantless search falls under one of the exceptions to the warrant requirement. *State v. Harris*, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

The "automobile exception" to the warrant requirement permits a law enforcement officer to search a vehicle without a warrant "if the officer has probable cause to believe that the automobile contains contraband." *State v. Saine*, 297 S.W.3d 199, 207 (Tenn. 2009) (citing *Carroll v. United States*, 267 U.S. 132, 149 (1925)). As our supreme court explained:

> The rationale for the automobile exception is two-fold. First, it is often impractical for officers to obtain search warrants in light of the inherent mobility of automobiles. Second, individuals have a reduced expectation of privacy in their automobiles. If the officer has probable cause to believe that the automobile contains contraband, the officer may either seize the automobile and then obtain a warrant or search the automobile immediately.

*Id.* (internal citations omitted). "The scope of a warrantless search of an automobile" is "defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825.

We have reviewed the dashcam video. For the most part, we agree with the trial court's extensive written factual summary of what the video depicts. We disagree, however, with the trial court's interpretation and conclusions of law with respect to the actions depicted on the video. The trial court's written summary of the video provides in pertinent part:

> The troopers continue their search, with the latter [Trooper Foster] climbing under the vehicle and tapping on various panels. At about 10:59, Trooper Cothron goes back into his car to call someone about getting further information on the [D]efendant, [Co-Defendant] Killian, and [Co-Defendant] Snipes; only Trooper Cothron's part of his conversation is clearly audible. Trooper Foster continues his search in the meantime, pulling back a portion of the rear bumper of the vehicle to do so. Trooper Cothron remains on the phone until about 11:05:30, after which he gets out of his car again.

At about 11:06:00, Trooper Cothron tells Trooper Foster whoever he had called- -presumably dispatch - -is "working on it."

From 11:06 to 11:09, neither trooper engages in any active searching. Instead, the two can be heard on the audio talking about the [D]efendant and his companions. This discussion includes at least one reference to "identity theft," as well as talk about what the troopers have learned of the men's criminal histories; at about 11:08:15 one of the troopers describes them as "bad dudes." At 11:08:53, Trooper Foster specially says, "They done something. I don't know what it is. You know what I mean?"

The troopers first mention the spare tire on the rear of the vehicle at 11:09:03, when one asks the other if it has been looked at. At 11:09:30, Trooper Foster punches around the tire several times, telling Trooper Cothron when punching the bottom, "It's harder down here." The troopers ask the [D]efendant if the impact driver fits the spare, and he tells them it fits all the tires. Trooper Cothron then uses the impact driver to remove the spare from the vehicle at 11:10:10. Neither trooper asks consent to do this.

In its conclusions of law, the trial court found that the troopers' thirty-minute thorough search, in which they "closely examined virtually every part of the vehicle . . . even though they had no reason to suspect the [D]efendant and his companions might be transporting narcotics in large quantities" should have, and did, in fact, dispel any suspicions they might have had that were based on "specific, articulable facts[,]" as "borne out" by the fact that "[b]y 11:06 in the video, three minutes before either turns his attention to the tire, the troopers have completed their search." The trial court gave "great weight" to that three minute delay, noting that the troopers' "decision to extend the duration of the stop without continuing the search at this point has not been explained by the troopers or by the State, though from the video it seems they may have been waiting for a call back from some unidentified party." The trial court also placed great weight on "the scope of the search the troopers engaged in[,]" finding that "the troopers initially had reason to suspect that the [D]efendant and his companions might have concealed personal use amounts of drugs somewhere in the vehicle" and that "neither testified that it would be normal to expect small amounts of drugs to be hidden in such a location."

We respectfully disagree with the conclusions reached by the trial court. As an initial matter, we note that for almost two minutes of the three-minute delay in the troopers' active search of the vehicle, Trooper Cothron is silent and looking over toward the shoulder of the interstate where Trooper Foster, Co-Defendant Killian, and the Defendant are located out of camera range. During that time, Trooper Foster speaks with the Defendant and Co-Defendant Killian, although much of their conversation is inaudible. It is only in

the last minute that the troopers start talking together about the defendants being "bad dudes" and knowing that they have "done something." One of them mentions the possibility of contraband being hidden inside the tires, and it is at that point that Trooper Foster asks if Trooper Cothron checked the spare tire. Based on our review of the video, we agree with the State that the troopers had not completed their search of the vehicle but were merely waiting for further information about the defendants from dispatch and for Trooper Foster to ask further questions of the Defendant and Co-Defendant Killian about their backgrounds.

We further agree with the State that neither the duration nor scope of the search was unreasonable under the circumstances of the case. A search must be "reasonably related in scope to the circumstances which justified the interference in the first place[,]" *Terry v. Ohio*, 392 U.S. 1, 20 (1968), and a detention "temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "[T]he proper inquiry is whether during the detention, the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *State v. Simpson*, 968 S.W.2d 776, 783 (Tenn. 1998). "[A] reasonable traffic stop can become unreasonable and constitutionally invalid 'if the time, manner or scope of the investigation exceeds the proper parameters.'" *State v. Troxell*, 78 S.W.3d 866, 871 (Tenn. 2002) (*quoting United States v. Childs*, 256 F.3d 559, 564 (7th Cir. 2001)). However, "no hard-and-fast time limit exists beyond which a detention is automatically considered too long and, thereby unreasonable." *State v. Justin Paul Bruce*, No. E2004-02325-CCA-R3-CD, 2005 WL 2007215, at *7 (Tenn. Crim. App., Aug. 22, 2005), *no. perm. app. filed*.

The total duration of the traffic stop prior to the discovery of the methamphetamine was under an hour, and only three to three and a half minutes elapsed between the troopers' pause in their search of the vehicle until Trooper Foster began his examination of the spare tire. We disagree with the trial court that the troopers were limited in their search to areas that were likely to contain "personal use" amounts of drugs. Although each trooper acknowledged on cross-examination that it was the first time he had found contraband hidden inside a spare tire, each also testified about having received extensive training in the use of hidden compartments in vehicles used by traffickers to conceal contraband. Trooper Cothron additionally testified that the quick turn-around trip to California, a source state for illegal drugs, along with the unusual tire tools and tire weights, increased his suspicions because drug traffickers are known to make quick turn-around trips. We, therefore, conclude that the trial court erred in granting the Defendant's motion to suppress.

## CONCLUSION

Based on our review, we reverse the order of the trial court granting the Defendant's motion to suppress and remand to the trial court for further proceedings consistent with this opinion.

_____
JOHN W. CAMPBELL, SR., JUDGE